The Toledo, Peoria and Warsaw Railway Co.

*v.*

Michael Conroy.

1. Evidence — *opinion of expert.* Where a railway company was sought to be charged with the death of a person, resulting from a defective bridge on its road, the court refused to permit the company's bridge builder to give his opinion, as an expert, whether the accident was caused by defects in the bridge or not. The condition of the bridge was shown by other witnesses, they testifying to facts: *Held,* that the court did not err in refusing the testimony, as the condition of the bridge, at the time of the accident, was not a scientific question.

2. Negligence—*duty of railroad company as to its bridges.* Railroad bridges over which trains are to pass should be constructed of the best and most durable material, as will insure the greatest safety to the traveling public. No matter of what material they are constructed, they should be subjected periodically, in each year, to the closest examination, or the company will be negligent in the discharge of its duty.

3. Where a railroad bridge was a trestle-work, constructed of timbers fifteen years before an accident thereon resulting in the loss of life, and many of the timbers were rotten at the heart, and some of the tenons rotted off, and the company had been notified of its unsafe condition before, and had only made some slight repairs at one end only, and had made no thorough examination and repairs, it was *held,* that the company were negligent to such a degree as to merit the severest censure. Actual knowledge of the defects is not necessary, but it is sufficient if the company might have been informed, by the use of such diligence as the law requires.

4. Same—*injury to servant from negligence of fellow servant.* While it is true that a railroad company is not liable for an injury to a servant occasioned by the negligence of a fellow servant in the same line of employment, yet this rule has no application to an injury caused by defects in the machinery of the company, its track or bridges, which it might have known and provided against by the exercise of the highest care and diligence, it being the duty of such companies to furnish their servants safe materials and structures, and keep them in proper repair.

5. Same—*degree of diligence required.* Where a servant of a railway company is injured or killed in consequence of the giving way of a wooden bridge, which is defective through age and exposure to the weather, the company can not escape liability from the fact that the bridge was constructed properly in the first place, and it employed skillful and competent subordinates to inspect and repair its bridges. Ordinary prudence in such a case is not sufficient, but the highest degree of vigilance consistent with the practical operation of the road is required.

6. Same—*instruction as to.* In a suit against a railway company to recover for a personal injury received in consequence of a defective bridge over which its trains passed, an instruction which seeks to make the defendant's liability depend upon actual knowledge of the defects, and leaves out of view the strong obligation resting upon the company to use all reasonable means to acquire knowledge of the condition of its road, bridges and other structures, is properly refused.

7. Same—*duty of railway companies in general.* It is the duty of a railroad company to the public, as well as to those in its employment, to have its road and bridges and other appurtenances constructed of the best material, having in view the business to be done upon it. In their cons.ruction they should equal those of the best roads doing an equal

amount of business, and the utmost care and vigilance bestowed in keeping them in a safe condition. The law will not allow them to be out of repair any longer than is consistent with the highest degree of diligence. And further, it is its duty to keep a sufficient force at command, and of capacity sufficient to discover defects, and apply the remedy. Neglecting to keep its road, etc., in the best condition, if injury or loss occurs thereby, the company will be liable, unless it is shown that the defect was one that could not be discovered and remedied by any reasonable skill or foresight.

APPEAL from the Circuit Court of Peoria county; the Hon. SABIN D. PUTERBAUGH, Judge, presiding.

The facts of this case are stated in the opinion of the court, except that the refused instructions, referred to in the opinion, are as follows :

"20. The jury are further instructed, that if they believe, from the evidence, that the defendant, in its character of master, properly constructed its said bridge, with the approaches thereto, and that the defendant employed and kept skillful and competent subordinates to supervise, inspect and repair its bridges and approaches, and if the jury believe, from the evidence, that ordinary prudence was exercised by said company, through such servants, for the proper maintenance of the bridge at which said accident occurred, then the jury will find for the defendant.

"21. The jury are further instructed, that if they believe, from the evidence, that the bridge structures of the defendant, and especially the bridge at the place where the accident occurred, were properly made and constructed, and that if the defendant employed, and kept in employ constantly, competent and trustworthy mechanics and engineers, and that if said bridge was tested by the most severe strains and tests, such as switching heavy trains upon the same, and that the efficiency of said bridge was thus tested, if the jury believe the same appears, from the evidence, to have been a proper test, then, if the bridge of defendant turned out to be insufficient, the jury will find for the defendant.

"23. Actual notice of the insufficiency of the structure must be brought home to the knowledge of the officers controlling the corporation, or in charge of the same or its structures, to make the defendant liable; and if the jury believe, from the evidence, that the outside of the timbers in this case were sound, and splintered from the contact of the locomotive, in this case, with the bridge, and if the jury believe, from the evidence, that said timbers were sound on the outside, and that any unsoundness in the same was invisible, and that any unsoundness in said timbers, or any insufficiency in the same, was not brought home to the knowledge of the defendant, then the defendant is not liable."

Messrs. INGERSOLL & McCUNE, and Mr. GEO. PUTERBAUGH, for the appellants.

Mr. H. W. WELLS, for the appellee.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This was an action on the case, under the statute, brought in the Peoria circuit court by Michael Conroy, administrator on the estate of John Conroy, against The Toledo, Peoria and Warsaw Railway Company, to recover damages for the death of John Conroy, caused, as is alleged, by a defective bridge erected by the defendants.

The cause was tried by a jury, who found for the plaintiff fifteen hundred dollars in damages, on which finding the court, after overruling a motion by defendants for a new trial, rendered judgment.

To reverse this judgment the defendants appeal, and assign several errors, on which they raise points, which we have fully considered.

The first point elaborated by appellants is, the refusal of the court to permit appellants' bridge builder, John Palmer, to give his opinion, as an expert, whether the accident was caused by defects in the bridge or not.

We do not think there was any error in this, as the condition of the bridge at the time of the accident was not a scientific question—not a question to which an expert bridge builder could give any more satisfactory answer than practical business men of common observation and experience could give. The most renowned bridge builders of modern times would be no more competent to pronounce on the defects in the timbers of that bridge than the miller, Jackson, who saw, from his mill door, the bridge give a lurch to the south when an engine went on it, not far from the spot where the engine in question went off, and who examined the timbers, and saw with his own eyes the trestle work, and who says there was nothing there of any account to support the upright—the tenon was rotted off. Several other witnesses testify to the same effect, rendering the opinions of experts of no value. Their testimony was to the facts themselves, as they existed at the time of the accident.

The point next urged by appellants, and with great zeal and ability, is, that the testimony of appellee presents no basis on which to raise a presumption of negligence in regard to the bridge, as they have failed to prove that the bridge was the proximate cause of the accident, or that the train broke it down in passing over it on the rails, and hence, they argue, the condition of the bridge timbers after the accident furnishes no presumption that the bridge was so decayed as to be unsafe.

Their theory is, that the engine left the track before it got on the bridge; that it plunged along the ties, and in this manner struck the timbers of the bridge. This, they argue, would furnish no evidence of negligence.

There was much testimony to this point. Witnesses for appellants, persons in their employment, with one exception, sustain this view, whilst those on behalf of appellee, who examined into the condition of the track near the east end of the bridge, where the accident occurred, concur in saying there were no indications tending to sustain such a proposi-

tion.  Here was a conflict which it was the peculiar province of the jury to settle, and we can not say they have settled it improperly.  There is much testimony from which the jury might fairly infer the bridge broke down from the rotten and decayed condition of the timbers.  It had been erected about fifteen years—a common trestle bridge, uncovered and unpainted.  An ordinary wooden structure like that, exposed to the storms of fifteen years, should be expected to be, by the end of that term, in a state of decay demanding the utmost vigilance of the company.  They were bound to know the nature of the structure, and they are justly chargeable with negligence in failing to find out and remedy its defects.  It is in proof such was the condition of some of the materials that a stick could be easily thrust into them, and though they exhibited no outward sign of decay, were rotten at the heart.

Not a person in the employment of the company stated that any tests were made, such as by boring or chopping, to ascertain the condition of the timbers.  They had, months before the accident, direct notice of the unsafe condition of this structure.

It is true, some repairs had been put on the bridge a short time before the accident, but there was no thorough overhauling, no searching to find out defects—a glance being deemed sufficient to satisfy the employees of the company of its safe condition.  Trains of cars had passed over it safely the day before, and it had been subjected, quite recently, to the heaviest strains which can be imposed upon a bridge : the switching being done upon it.  All this should have admonished the company that the structure required a thorough examination.  One so frail as that was, could not reasonably be expected to survive forever all the shocks to which it must be subjected.  The pitcher taken once too often to the fountain, was at last broken.  It was the last feather that broke the camel's back.

In the light of the evidence, as we read it, we do not see how the jury could have found on the question of negligence

otherwise than they did find. The bridge was a dangerous structure, and known to be so by appellants. Railroad bridges should be constructed of the best and most durable material —of such material as will promise the greatest amount of safety to the public. If wood is not that material, iron should be used. But of whatever material, they should be subject, periodically, in each year, to the closest examination. Some evidence was introduced to show this bridge had been repaired not long before this accident; but those repairs were slight, and at the west end. No thorough examination and repairs were had, and in this appellants were negligent, and to such a degree as to merit the severest censure.

It is further urged by appellants, to sustain their theory, that the engine was reversed, which could not have been done by the driver if the bridge had given way directly under him —that it was not possible for him to reverse his engine on a falling bridge.

This is mere conjecture of the witnesses. No person testified that the engine was reversed by the driver. A witness, named Barney, testified he was an engineer; saw this engine; it was right side up; went along the track, and could see no signs that it had been off the track before it reached the bridge; the train was going west; the steam was let on *reverse;* the lever stood in a reverse position; it is held by a dog slipping into notches on the quadrant; in this engine the notches were all mashed over; think the fall occasioned it; the notches were mashed over on the reverse side, of course, as the lever would be forced back; looked to see if the engine was off before it came to the bridge, but saw no signs; think the fall caused the reversed lever to be knocked back; the notches in the quadrant looked as if it had been forced back; they were mashed.

There is nothing to question this testimony, and it fully explains how the engine happened to be reversed. It was caused, no doubt, by impinging upon the obstacles it met in falling through the bridge; and that the bridge fell by its

own weakness and inability to support, at that moment, the weight then upon it, there can be no doubt.

It is further urged by appellants, if the death of Conroy resulted from the negligence of the superintendent of the bridge department, appellants are not liable, because deceased and the superintendent were fellow servants in the same general undertaking.

It is unnecessary to comment on the many cases cited by appellants in support of the proposition that the doctrine of *respondeat superior* has no application here.

The principles which rule this case have been fully stated in *Chi. and N. W. R. R. Co.* v. *Swett, Admr.* 45 Ill. 201, and *Ill. Central R. R. Co.* v. *Welch,* 52 ib. 183, in which it was held that railroad companies are bound to furnish their servants safe materials and structures, and must keep them in proper repair ; and a person entering the service of a railroad company has a right to presume that, in these respects, the company has discharged its obligations.

The case last cited modifies, to some extent, what was said in Swett's case.   And the doctrine of that case is further qualified by what was said in *Ill. Central R. R. Co.* v. *Philips,* 49 ib. 234, and in *Pittsburgh, Cincinnati and St. Louis Railway Co.* v. *Thompson,* 56 ib. 138, the result of which rulings is, not to hold these companies as insurers that their road and appurtenances and instrumentalities are safe and in good condition, but that they must do all that human care and vigilance and foresight can reasonably do, consistent with the modes of conveyance and the practical operation of the road, to put them in that condition and keep them so.

This certainly is a wholesome rule, as well for the public as for the companies, for it is to their interest to have their road and appliances safe and in the best condition.

In Philips' case it was said, these companies are required to employ experienced, efficient, skillful and prudent agents, servants and artisans; they must provide and use properly constructed machinery, well constructed by competent and

skillful workmen, when manufactured by the company, and from good materials; they must employ competent, skillful, prudent and sober men to use such machinery, and in doing so they must be careful and vigilant in its examination, to see that it is in proper repair and in a safe condition. On the other hand, they are not answerable for latent defects in materials employed in the construction of their machinery, which the usual and well recognized tests of science and art afford for the purpose but fail to detect; nor are they liable for accidents occurring, by which injury ensues, when skill and experience are not able to foresee and avoid them.

Applying what is here said to this bridge, appellants are inexcusable, for an auger or an ax properly applied would have revealed the rotten condition of these timbers, and its consequent insecurity. No matter if the bridge was skillfully built when erected, time and exposure to the elements had smitten it with certain decay, which the simplest tests would have discoverd to the company.

As was said, when this cause was before us· at a former term, the rule is settled, that while a railway company is bound to use the highest degree of diligence consistent with the operation of the road, in furnishing to the public a safe road-bed, yet it is not an absolute insurer, and can not be held liable for defects which such diligence would not reveal. Actual knowledge of the defect is not necessary—it is sufficient if the company might have been informed, by the use of such diligence as the law imposes upon it; but when it did not know, and could not have informed itself of the defect, the company would not be responsible.

It is very apparent, as we have before said, by the application of the simplest tests the defects in this bridge could have been known.

We perceive nothing in any of the instructions given for the appellee which militates against the doctrine announced in these cases, and we think they stated fully the law of the case.

As to the three instructions asked by appellants and refused, being the 20th, 21st and 23d, we think the first in the series does not go far enough, and, if given, would have misled the jury. The company may have constructed the bridge properly in the first instance, and they may have employed skillful and competent subordinates to inspect and repair their bridges, but ordinary prudence in this regard was not sufficient. The highest degree of vigilance, consistent with the practical operation of the road, was required.

The objection to the 21st is, that switching trains on a bridge is not the only test to which this structure should have been subjected, and giving the instruction could not have failed to mislead the jury.

The objection to the 23d and last is obvious. It leaves out of view that strong obligation resting on railroad companies, to use all reasonable means to acquire knowledge of the condition of their roads and bridges and other structures. From the testimony, there was no latent defect in the materials composing this bridge that an auger or an ax would not have exposed. Railroad companies should, with a view to their own interests if not to that of the public, ascertain, by every reasonable and practicable means, the condition of their wooden bridges and trestles on which they are built. Failing in this, they must not expect juries or courts will excuse them.

The duty owing by a railroad company to the public as well as to those in their employment is, that their road and bridges and other appurtenances shall be constructed of the best material, having in view the business to be done upon it. In their construction they should equal those of the best roads doing an equal amount of business, and the utmost care and vigilance bestowed upon keeping them in a safe condition. The law will not allow them to be out of repair an hour longer than the highest degree of diligence requires. And, further, it is their duty to keep a sufficient force at command, and of capacity sufficient to discover defects and apply the

remedy. Neglecting to keep it in the best condition, if injury or loss occurs thereby, the companies will be liable, and they ought to be so liable. From this responsibility they can not be relieved, except by showing that the defect was one which could not be discerned or remedied by any reasonable skill or foresight, which can not be claimed in this case.

Perceiving no error in the record, the judgment must be affirmed.

*Judgment affirmed.*