302 C. & N. W. R. R. Co. *v.* Moranda. [Sept. T.

Syllabus.

# THE CHICAGO AND NORTHWESTERN RAILROAD COMPANY

*v.*

## FREDERICKE MORANDA, Admx.

1. MASTER AND SERVANT—*of the rule respondeat superior.* Where one servant receives injury through the negligence or want of care on the part of a "fellow servant," the common master will not be liable for the injury,—but if the servants do not hold the relation of "fellow servants" within the rule, the master will be liable.

2. SAME—*who regarded as "fellow servants."* In order to constitute servants of the same master "fellow servants," within the rule *respondeat superior*, it is not enough that they were engaged in doing parts of some work or in the promotion of some enterprise carried on by the master, not requiring co-operation, nor bringing the servants together, or into such personal relations that they could have exercised an influence one upon the other promotive of proper caution in respect of their mutual safety,—but it is essential either that they were actually co-operating at the time of the injury in the particular business in hand, or that their usual duties should bring them into habitual consociation, so that such proper caution would be likely to result.

3. SAME—*former decisions.* In the case of *Chicago and Alton Railroad Co.* v. *Murphy*, 53 Ill. 336, it was said: "When the ordinary duties and occupations of the servants of a common master are such that one is necessarily exposed to hazard by the carelessness of another, they must be regarded as fellow servants, within the meaning" of the rule which exempts the common master from liability in cases of this character. This language was referred to with approbation in the case of *Valtez* v. *Ohio and Miss. Railway Co.* 85 Ill. 500,—but, as a definition of what shall constitute fellow servants in this class of cases, it is regarded as laying down the rule too broadly, and is disapproved.

4. SAME—*application of the rule to the particular case.* Where a servant of a railway company, whose duty it was with others to repair and keep in order a section of the road, while engaged in such duty, and standing some five or six feet from the rail of the track to avoid a passing train, was struck on the head by a large lump of coal, which was carelessly cast by the fireman of the train from the tender, from the effects of which the person injured died, — *held*, that the company was liable to his personal representative for damages, under the statute. The track repairer and the fireman on the passing train were not regarded as fellow servants, within the rule.

5. MEASURE OF DAMAGES—*death of person occasioned by negligence—evidence to be considered.* In an action by an administratrix of the estate of a deceased person to recover pecuniary compensation, under the statute, against the party whose fault or carelessness caused the death, it is proper to show the amount of the usual earnings of the deceased, and that the plaintiff was his wife in life and that they had minor children whom he was, by law, bound to support

and who usually shared his income, but it is wholly immaterial whether such next of kin has or has not other pecuniary resources after his death. It is error to admit proof that the plaintiff and her children had no other means of support save that arising from his daily earnings.

APPEAL from the Circuit Court of Lee county.

Mr. B. C. COOK, for the appellant.

Mr. A. K. TRUSDELL, and Mr. J. D. CRABTREE, for the appellee.

Mr. JUSTICE DICKEY delivered the opinion of the Court:

John Moranda was the foreman of a party of track repairers, whose duty it was to repair and keep in order a section of the railroad track of appellant, and to be upon the track and see that it was kept in order for the running of trains. The hypothesis on which it is sought to sustain the recovery in the circuit court in this case is, that while Moranda was so engaged in this duty an express train passed by at the rate of some thirty to thirty-five miles an hour; that on the approach of the train to the place where Moranda and his party were at work on the track they stepped aside to avoid the passing train, he standing some five or six feet from the nearest rail of the track; and that as the train passed, a large lump of coal was carelessly cast by the fireman from the tender attached to the locomotive, which struck Moranda and caused his death.

This is an action, under the statute, by the administratrix of the estate of deceased. Appellant pleaded not guilty. A trial by jury resulted in a verdict of guilty, and an assessment of plaintiff's damages at the sum of $4000, and after overruling a motion for new trial, the court rendered judgment upon the verdict.

On the trial the plaintiff, who is the widow of deceased, was permitted to prove that after the time of the death of Moranda she and her children had no other means of support, save that arising from his daily earnings. The utmost that can lawfully be recovered, in actions of this kind, is compensa-

304     C. & N. W. R. R. Co. *v.* MORANDA.    [Sept. T.

Opinion of the Court.

tion for pecuniary loss suffered by the widow and next of kin. It was entirely proper to show the amount of his usual earnings, and that plaintiff was his wife in life, and that they had minor children whom he was by law bound to support, and who usually shared his income; but it was wholly immaterial whether such next of kin had or had not other pecuniary resources after his death. Such evidence was held incompetent in *O'Brennan's case* (65 Ill. 160), and in *Powers' case* (74 Ill. 343).

Where the next of kin consist of collaterals, or persons whom the deceased in life was. not bound by law to support, unless in a state of dependence, it may be proper to show that in his life they were supported by him. The question is, in such case, what pecuniary loss has been suffered by the next of kin. Their poverty after the death can shed no light on this question. If immediately after this disaster the plaintiff and her children had, by inheritance from other sources, become at once wealthy, it would not have abated one cent from the amount of their lawful demand in this case—(if entitled to recover at all); nor can their poverty be permitted to add thereto.

For this error the judgment in this case must be reversed, and the cause remanded for a new trial.

There is, however, another question raised by counsel for appellant which will necessarily arise upon another trial, and ought therefore to be decided now.

It is insisted that "the plaintiff's intestate and the persons running the locomotive bore such relation to each other in the service of appellant, that one could not recover of the common employer damages caused by the negligence or carelessness of the other."

We think this position is not 'tenable. In *Chicago and Northwestern Railroad Co.* v. *Swett,* 45 Ill. 197, a case in which the fireman was killed by reason of the negligence of the track repairers, it was held that the doctrine in relation to fellow servants did not forbid the action.

In *Chicago, Burlington and Quincy Railroad Company* v. *Gregory*, 58 Ill. 272, the right of action was sustained where a fireman on a passing train was killed by a "mail catcher" improvidently placed too near the track by other servants of the railroad company. In that case it was said the agents charged with the duty of properly locating the "mail catcher" had no possible connection with the running of the trains, in which service the fireman was engaged, and it was added: "The duties were as different and as distinct as those of *a conductor* and of *a track repairer*."

In *Toledo, Wabash and Western Railway Co.* v. *O'Connor*, 77 Ill. 391, the plaintiff's intestate was, as in this case, a track repairer, and the injury was caused by the negligence of another servant of appellant, engaged at the time in running a train upon the track. There, the fault was that of another servant of the company—the engineer on the passing train. Here, the alleged fault was that of the fireman. It is not perceived how this case differs from that in principle. It was there held that the track repairer and the engineer of a passing train were not fellow servants, engaged in a common service, so as to exempt the employer from liability for the injury of the one by the neglect of the other.

Unless we are to overrule these, and other decisions of this court, we can not sustain the appellant in the proposition that this action is barred by the relation of these servants as fellow servants.

Counsel for appellant presses upon our attention what was said by this court in the case of *Chicago and Alton Railroad Co.* v. *Murphy*, 53 Ill. 336. In that case the servant injured was one of a party of laborers at a station, whose ordinary duties were to examine arriving trains, and take out for repairs any cars in the train needing the same. The injury was caused by the negligence of the engineer operating the switch engine used at that station for that purpose. This court, upon the facts of that case, held that the servant injured and the offending engineer "were strictly fellow servants of a common mas-

20—93 Ill.

ter, * * * engaged in the same general department, to-wit, the doing of the needed work upon the depot grounds for the purpose of dispatching the various trains." And it was there said : "Under these circumstances we are wholly unable to hold * * * that deceased and the engineer were not fellow servants in such a sense as to subject them to the well established rule exempting the common master from liability in cases of this character."

After having thus pronounced the judgment of the court upon the question arising upon the facts of the case, the learned justice who delivered the opinion of the court proceeds to comment upon an instruction which the circuit court had refused to give to the jury, and says, in that connection : "When the ordinary duties and occupations of the servants of a common master are such that one is necessarily exposed to hazard by the carelessness of another, they must be * * * regarded as fellow servants, within the meaning of this rule."

Counsel for appellant, seizing upon this statement, insists that the judgment in the case at bar must be reversed on that ground, or the rule indicated in the case in 53 Ill. must be expressly overruled.

The decision of that case was undoubtedly correct, and does not, in any degree, militate against the views we have of this case ; but the language of the opinion used in commenting upon the instruction in question in that case, was plainly too broad, and can not be sustained without overruling the decisions of this court in very many cases. In fact, in that very opinion it is said : "It is, of course, not easy to define who are to be considered fellow servants with such accuracy that doubtful cases will not occur." As applied to the facts of that case, the instruction in the *Murphy case* could lead to no false conclusion, but as a definition of what shall constitute fellow servants in this class of cases, the language is plainly faulty.

If the law of this State be properly stated in that instruction, then, indeed, no action will lie for any injury in any case where

the servant injured and the servant at fault were, at the time of the injury, each engaged in the ordinary duties of his service, no matter how widely removed may be their employments from each other. It is plain that if the injury did actually occur to one while in his ordinary employment, and from the negligence of the other while he was in his ordinary employment, the negligent conduct of the latter must necessarily have endangered the safety of the former. If the law be properly stated in that instruction, we ought to overrule the decisions of this court in *Shannon's case,* 43 Ill. 338, and in *Swett's case,* 45 id. 197, and in *Welch's case,* 52 id. 183, and in *Ryan's case,* 60 id. 171, and in *O'Connor's case,* 77 id. 391, and in other like cases. In all these cases, both the plaintiff and the man by whose negligence the injury was caused, at the time of the injury " were in the employment of the defendant, and their ordinary occupations in such service bore such relation to each other that the careless and negligent conduct of the servant at fault endangered the safety of the plaintiff." Otherwise he could not have been, in such case, injured in fact, and yet in all these cases it was held the action would lie. We are not prepared to overrule these decisions or depart from their teachings, and are, therefore, upon mature consideration, compelled to disapprove of what was said in the *Murphy case* about the instruction discussed in that opinion, although it seems afterwards to have been referred to with approbation in the case of *Valtez* v. *Ohio and Mississippi Railway Co.* 85 Ill. 500.

What we have said is enough to dispose of this case, but the able, earnest and elaborate argument of counsel for the appellant seems to call for some further discussion. Recognizing that his position is not in accord with the decisions of this court in the cases referred to *supra,* wherein the common master has been held liable for damage done to one employee, by the negligence of another engaged in the same general enterprise, counsel for appellant presses upon our attention arguments and expressions of opinion found in our own reports in other cases where the master has been held exempt, which may seem in-

compatible with the rulings in the cases where the master has been held liable; and he supports his position by quotations from cases in English and American courts, which are certainly directly in point.

The decisions of courts of other States and the modern decisions of the English courts, though entitled to great consideration, are not binding authority in this State, and should have force here only in so far as the reasons upon which they rest may be found cogent and sound. And arguments and expressions of opinion found in our own reports, where they conflict with the *decisions* of this court, must always yield to the decisions.

It is no doubt true that many expressions found in the various opinions on this subject in our own reports, if read without reference to the facts under discussion, seem to be incapable of being reconciled; but it is equally true that a careful examination of the facts of the several cases in our reports, and an examination of the judgments pronounced in these same cases, will show remarkable harmony and uniformity in the *decisions*. Many of these decisions are not in harmony with the modern decisions in England, nor with the rulings in most of the States in this country ; but it is believed they are founded in reason and are in harmony with each other.

Redfield, in his work on the Law of Railways, vol. 1, sec. 131, says: "It seems now perfectly well settled in England, and mostly in this country, that a servant who is injured by the negligence or misconduct of his fellow servant, can maintain no action against the master for such injury." This is undoubtedly true, but the courts do not all agree as to what is necessary to render employees of the same master " fellow servants " within the meaning of this rule. The same author lays down what may be called the English doctrine on this question to be, that "all the servants of the same master engaged in carrying forward the common enterprise, although in different departments, widely separated, or strictly subordinated

to others, are to be regarded as fellow servants, bound by the terms of their employment to run the hazard of any negligence of any of the number, so far as it operates to their detriment." In other words, where the general object to be accomplished by the service of each is one and the same, the employer the same, the several servants deriving authority and compensation from the same source, all employees and agents, from the highest to the lowest, are regarded by the English rule as fellow servants, no matter how remote from each other they may usually be occupied, or how distinct in character and nature may be their respective duties and employments. It is also true that this is the rule approved by the courts of last resort in most of the States in this country. We speak of this for convenience as the English rule, but in truth, its boundaries, as stated by Redfield, were first defined, in substance, by Ch. J. SHAW, in the case of *Farwell* v. *Railroad Co.* 4 Metc. 49. And that case has very generally, and not improperly, been regarded, both in England and America, as the leading case in support of what we call the English rule. In this State this doctrine of exemption of the master has never been carried so far.

In several of the States this rule is subjected to limitations and is not carried to so great an extent. In this court, and in the courts of last resort in other States, the master has been held liable where the servant injured was in a subordinate position and the offending servant stood to the other as the representative of the master, and in other cases where the servants in question had no connection with each other in their service other than that of having a common master and of being engaged in a common enterprise.

The courts which maintain the English rule are not harmonious in their reasons for its support, and the courts wherein the rule is qualified by limitations do not agree, in all respects, as to the limitations to be placed upon the rule, nor do they agree entirely as to principles on which the rule is founded or by which the limitation should be controlled.

The exemption of the master from liability, in case of an

injury of one of his servants by the neglect of another, is a rule comparatively new. Our attention has not been called to any mention of such a rule, or any allusion to it made in any reported case or by any law writer, until it was asserted in the case of *Priestly* v. *Fowler*, 3 Mees. & Welsb. 1, which arose in the Court of Exchequer, in the year 1837. It was there said that no precedent could be found for an action by a servant against his master for damages caused by the neglect of his fellow servant. In the 7th edition of Story on Agency, sec. 153 *d*, it is said that this question "has not until recently become a subject of judicial examination." The history of this doctrine is given in that work, in that and other sections immediately succeeding that, and in the copious notes thereto found in that edition.

The rule of exemption of the master in such cases is very generally placed upon the ground of public policy, that is, upon what is thought best for the well being of society. In the very first case where the question arose, *Priestly* v. *Fowler*, *supra*, the decision is placed squarely on that ground. The second case on this subject, of which we have any account, is that of *Murray* v. *South Carolina Railroad Co.* 1 McMullen, 385, decided in February, 1841. The case of *Priestly* v. *Fowler*, *supra*, evidently was then unknown to that court, for it is there said no precedent upon the subject can be found. The master was there held exempt from liability—by a divided court. The judges concurring in the judgment did not rest their judgment upon the same ground. What seems the ablest argument in favor of the judgment in that case, was made by Blanding. He says: "No man shall be liable for another's act except he has commanded it or has agreed to be so liable, or where such liability has been imposed on him by law, from principles of policy or for the public security." p. 391. And again : "If this (the public security) will be best promoted by making each person engaged in running the train risk all the injuries he may receive, without resort to his employer, then he should be excluded from such resort."

In Cooley on Torts, 541, it is said, " the rule is one of general public policy ; " and again, that " in many employments the public are compelled to rely upon the caution and diligence of servants as the chief protection against accidents which may prove disastrous to life or limb." This is the current of the authorities, and we think the true ground upon which the propriety of the exemption of the master in any such case can be sustained. The history of this doctrine of exemption of the master, as well as the best reasoning of the cases, shows that what we have spoken of as a *rule,* (exempting the master in certain cases,) is in fact but an *exception* or qualification of the ancient general rule of the common law, *respondeat superior,* which, prior to the case of *Priestly v. Fowler, supra,* was laid down without *qualification* by all courts and common law writers.

In Comyn's Digest, (title " Master and Servant," K,) it is said : "A master is liable for every act of his servant done by him in the course of his employment," (referring to 2 T. R. 154, where the rule is there stated in these very words).

In Viner's Abridgement, (" Master and Servant," B 9,) it is said : " If my servant doth anything prejudicial to another, it shall bind me, * * * being about my business." Thus the law was formulated by Ch. J. HOLT in *Tuberville* v. *Stamp,* Comb. R. 459. In the syllabus of *McManus* v. *Cricket,* 1 East R. 107, the law is formulated in the words: "A master is liable to answer for damage arising to *another* from the negligence or unskilfulness of his servant acting in his employment."

Blackstone, in his Commentaries, says: " If a servant by his negligence does damage to a stranger, the master shall be answerable for his neglect." 1 B. Com. 431. Paley, in his work on Agencies, published in 1811, says : "By the employment of an agent the employer becomes civilly responsible for his care and diligence to those who make use of him in his business." Paley on Agency, 294. And again, (295) " A master is responsible for the negligence of his servant in the

prosecution of his service," and the language of Ch. J. Holt is quoted, where he says, "Where a trust is put in one person, and another, whose interest is entrusted to him, is damnified by the negligence of such as that person employs in the discharge of that trust, he shall answer for it to *the party damnified*." 12 Mod. 490. Story, in the first edition of his work on Agency, published in 1839, says: "The master is always liable to *third persons* for &ast; &ast; &ast; negligences &ast; &ast; &ast; of his servants in *all cases* within the scope of his employment."

No limitation of this rule was ever anywhere suggested until this question arose of the liability of a master to his own servant for injury by the neglect of another.

In support of the English rule, it has since been suggested, inasmuch as Blackstone, in his statement of the rule *respondeat superior*, speaks only of "damage to a *stranger*," that the rule by its terms does not embrace the case of damage to a servant, or, as it is said in one case, "this presupposes that the parties stand to each other in the relation of·strangers between whom there is no privity;" and then assuming that there is a privity of some sort between the injured servant and some one else in relation to the act causing the injury, it is insisted that the case of an injury of one servant by the fault of another in nowise comes within the meaning of the rule as formulated by Blackstone. (*Farwell* v. *Railroad Co.* 4 Metc. 49.) In view of the words of older authorities *supra*, this reasoning seems artificial and unsatisfactory. It is hardly to be supposed that Blackstone intended, by the introduction of the word "stranger," to state or lay down *a limitation* upon the rule *respondeat superior*, as before that formulated in Comyn's Dig., 2 Term R., Viner's Abr., 1 East R., or as expressed long before in *Tuberville* v. *Stamp*, Comb. R. 459, or to qualify the same in any way whatever. If Blackstone had attached to the word "stranger," as used in that sentence, any special significance, it seems he would have given some explanation as to whom we should in that connection regard as strangers—some commentary on the departure from the language of the fathers

in the common law. It is not to be believed that Paley or Story, who formulated the rule after Blackstone's day, intended to state the rule more broadly than was their understanding of the meaning Blackstone intended to convey by the words used by him. It seems almost certain that had Paley or Story understood Blackstone as stating the rule of *respondeat superior* in a more limited sense than that of the earlier authorities, neither of them would have used the broad language of the older authorities without some comment on the language of Blackstone, and without assigning some reason for differing from a writer of such great authority. It seems more reasonable to infer, as we do, that Blackstone used the word stranger in the broad sense—meaning the same as if he had said, "damage to another," instead of "damage to a stranger." Kent so understood—for when he wrote in 1827, he said of a master, "He is said to be liable, if the injury proceeds from the negligence or want of skill in the servant."

We are brought to the conclusion that the general rule of *respondeat superior*, in its application to all cases arising before 1837, was applicable to all third persons falling within the true reason of the rule, and that the doctrine of the exemption of the master, in case of an injury of one fellow servant by the fault of another, is really an exception to the rule.

If this be so, to determine what cases fall within the rule, and what cases do not fall within the rule, it seems to be wise to consider carefully the reasons on which *the rule* itself rests, and then to place such cases, and such cases only, on the list of exceptions as are not within the reasons on which the rule is founded.

The common law rule—whereby the master is made to answer for damage done to others by the neglect of his servant— is plainly unjust, when applied to a case where the master has with due care employed a competent and careful servant, and is himself guilty of no wrong. As a mere matter of strict justice a man who has himself done no wrong ought not, as a

mere matter of justice, to be compelled to answer for the negligence of another.

The general rule, however, respondeat superior, although unjust as applied to the master in such cases as already shown, is as old as the common law, and is no doubt founded in wisdom. This rule, like many others, rests upon considerations of policy, upon the ground that the well-being of society is best promoted in that way. "In no other way could there be any safety to third persons dealing with principals through agents." (Story on Agency, sec. 452.) Cooley says, "the well-being of society is best subserved thereby." Ch. J. SHAW says, the rule *respondeat superior* "is adopted from general considerations of policy and security." *Farwell* v. *Railroad Co.* 4 Metc. 49. And again, in the same case, "the rule is founded on the expediency of throwing the risk upon those who can best guard against it."

If this be so, the liability of the master must turn upon the proper consideration, in each class of cases, of what ruling will in fact throw the risk upon those who can best guard against it, of what is demanded to promote in the highest degree the well-being of society. The best interests of society demand that all business should at all times be so conducted that the least possible harm shall be caused thereby; that all servants, and especially all servants controlling dangerous instrumentalities, shall constantly use due care. The position that the well-being of society in early days demanded in such cases the rule *respondeat superior*, was sustained upon the view then taken of the usual subordination of servants to the will of the master, and the usual devotion of the servant to the interests of the master. It seems to have been wisely thought that it would induce greater caution in servants to avoid injury to others, if servants knew that the master must answer for such injury; and also, that the responsibility of the master in such case would usually incite him to greater vigilance in promoting the desired constant caution in his servants. Where servants are habitually consociated in their daily duties, (as

most servants were at an earlier day in England,) they may well be supposed to have an influence over each other, and a power to promote in each other caution, by their counsel, ex-hortation and example, at least equal to that of the master, and perhaps greater. In such case the well-being of society does not seem to demand that the master should be made to answer, in cases where he had done all that he ought to do, and the injury was to one such servant and from the negligence of another. The vigilance of such servants in such case may well be supposed to have a greater stimulant to constant exercise if each one knows that neither he nor his comrades can have any redress for injury to one by the negligence of the other. But where servants of a common master are not consociated in the discharge of their duties,—where their employment does not require co-operation, and does not bring them together, or into such relations that they can exercise an influence upon each other promotive of proper caution,—in such case, the reason of the rule holding the master responsible for damage resulting from the negligence of one of his servants seems reasonably to apply with as great force as if a stranger were the party injured. The influence of one servant upon another in the encouragement of caution can not be relied upon in such case, for that can only operate where they are co-operating, or are brought together by their usual duties, or where there is habitual consociation. Then, indeed, in cases where they can not be supposed to have in their power in any way to promote caution in each other, the well-being of society, if it is to have any such security, must depend entirely upon the vigilance of the master in promoting constant caution in each of his servants, and upon the desire of servants to protect the master from liability. Hence the master must in such case be held responsible for the neglect of his servant.

The application of these views, it is believed, will render it entirely practicable to maintain the rule adopted by this court, recognizing a distinction between the case of co-servants, whose duties are entirely distinct from each other, and are not

such as to imply consociation or co-operation, and the case of co-servants consociated by means of their daily duties, or co-operating in the same department of duty or the same line of employment.

The line of argument, briefly stated, is this: The ancient common law rule which holds a master (even in cases where he is guilty of no fault) responsible for the neglect of his servant, where a third person suffers damage from the negligence of such servant, rests entirely upon considerations of its practical effect upon society,—upon considerations of policy; and these considerations of policy rest upon the idea that the subordination of the servant to the will of the master and his devotion to the interests of the master give him, under that rule, incentives to caution he would not otherwise have, and upon the idea that the rule will incite the master to greater vigilance in the selection of prudent servants, and to greater zeal in the exercise of his influence over his servant to secure the exercise of care in all cases. When the reason of the rule ceases, the application of the rule ought also to cease, and especially is this true of a rule which rests not upon its own justice, but solely upon considerations of policy. Where servants of the same master are directly co-operating with each other in a particular business at the time of the injury, or are, by their usual duties, brought into habitual consociation, it may well be supposed that they have the power of influencing each other to the exercise of constant caution in the master's work (by their example, advice and encouragement and by reporting delinquencies to the master) in as great, and in most cases in a greater, degree than the master. If, then, each such servant knows that neither he nor his fellow servant, if injured by the others' negligence, can have redress against the master, he has such incentive to constant care, and such incentive to the exercise of his influence upon his fellow to incite him to constant care, that the well-being of society in such case does not demand that the master be made to answer. The same

considerations of policy which, to avoid injuries to third persons, usually demand that the master be held responsible, seem plainly not to demand it in the case of such co-servants. But though servants are employed by the same master, and are engaged in doing parts of some great work carried on by the master, still, unless either their duties are such that they usually bring about personal association between such servants, or unless they are actually co-operating at the time of the injury in the business in hand, or in the same line of employment, they have generally no power to incite each other to caution by counsel, exhortation or example, or by reporting delinquencies to the master, and the well-being of society in such case must depend upon the devotion of the servant to the interests of the master, and the zeal of the master to promote a constant exercise of due care by his servant; and to bring these instrumentalities into action it becomes necessary (as in the case of an injury to a stranger) to adhere to the general rule that the master must answer for the neglect of his servant, and this, as already suggested, because the facts are such that society can not, in such case, avail itself of the mutual power and influence of one servant upon another for want of the necessary opportunity for its exercise, and hence must depend for inducements to caution which are supposed to follow the general rule of the master's liability.

An examination of the decisions of this court upon this question will show that the judgments are all in full and strict accord with these views, and it is believed no case can be found in our own reports, where the common master has been held exempt from liability for injury to one servant by the neglect of another, where it does not appear that the servants were either strictly co-operating in the particular work they were about, or were usually consociated in their ordinary duties.

The first case in this court where this question received consideration was that of *Honner* v. *Illinois Central R. R. Co.*

318       C. & N. W. R. R. Co. v. Moranda.     [Sept. T.

Opinion of the Court.

15 Ill. 550. The plaintiff was one of several servants of appellee engaged in adjusting a turn-table, when he was injured by the others so engaged with him. It was held he could not recover. Here, they were strictly co-operating in the particular work they were about.

In *Illinois Central R. R. Co.* v. *Cox*, 21 Ill. 23, the servant injured was a laborer on a wood train, and the injury was the result of the negligence and want of vigilance on the part of the engineer and conductor running the train, and it was held no recovery could be had. Here, they were consociated in their ordinary duties. They usually worked together.

In *Chicago and Alton R. R. Co.* v. *Keefe*, 47 Ill. 108, the plaintiff was a laborer on a construction train, and was injured by the neglect of the engineer and conductor operating the train. It was held the action would not lie. Here, they usually worked together.

In *Murphy's case, supra,* the injury was to one of a "repair gang," working at a station or yard, and was caused by the negligence of the engineer of a switch engine which was constantly engaged at that yard, and by which cars were switched for repairs. (53 Ill. 336.)

In *Gartland's case,* the injury was caused by the negligence of servants engaged in moving cars, and was done to one of their number—strictly an associate. (67 Ill. 498.)

In *Britz' case* (72 Ill. 256), a laborer on a construction train was injured by the negligence of the conductor and brakeman of the same train. And in the case of *Troesch* (68 Ill. 545), a conductor at a yard, who directed and assisted in making up trains, claimed to have been injured by the fault of the switch engine-driver engaged in making up the same trains, and they were held fellow servants.

In *Keene's case* (72 Ill. 512), the servant injured was a brakeman, and the fault was that of the engineer on the same train.

In *Durkin's case* (76 Ill. 395), a laborer, or shoveller, on a gravel train was injured by the neglect of the engineer on the same train.

In the case of *Rush* (84 Ill. 571), it was a brakeman, who was alleged to be injured by the default of the engineer operating the same train.

And in the case of *Valtez* (85 Ill. 500), a car-repairer at a station or yard was injured by the negligence of the engine-driver of the switch engine used at the same yard.

It is insisted, in substance, that the reasons assigned in support of these decisions are such that they should govern in this case, and others in which this court has held the common employer liable.

Thus it was said, " There are certain perils incident to all employments, and which both parties have in view when the engagement is made," * * * and " which the employer does not undertake to insure against," (*Honner's case*, 15 Ill. 552); but in the same case it was said, " I would be far from saying that there may not be cases of carelessness * * on the part of those to whom the corporation may entrust the management of its concerns, producing injury to the employees of the company for which it would be liable."

And in *Cox's case, supra,* it was said, " It is right and proper that one servant should not recover against the common master for the carelessness of his fellow servant," etc.; but the reason assigned was, " it is important to all concerned that each servant should have an interest in seeing that all his co-servants do their duty ;" and it is plain this reason can only apply in cases where the service of the one bears such relation to the other that such servants may have it in their power to exercise an influence to that end.

And in *Gartland's case* it was said, " by so entering into this employment" he " took upon himself the natural and ordinary risks and perils incident to the service in which he engaged, among which was the carelessness of his fellow servants." (67 Ill. 498.)

The same suggestion that the employee, by his contract of service undertakes the hazard of the occasional negligence of fellow servants who are generally careful, and that the

employer does not warrant against such hazard, has been expressed in *Durkin's case* (76 Ill. 395) and in *Valtez's case* (85 Ill. 500), and perhaps in other cases. But it must be remembered that this contract thus spoken of is in no case supposed to be an express contract. It is an implied contract to which reference is made, and it must also be remembered that *implied promises* are mere fictions of the law whereby one is supposed to undertake to perform the duties imposed upon him by law. In Kerr's Action at Law, 3d Ed. by Smith, page 144, it is said, implied contracts arise "from this general implication and intendment of courts, that every man hath engaged to perform what his duty and justice require."

Chief Justice SHAW, in discussing the question whether the common master of fellow servants rests under any implied promise to protect one against the negligence of the other, says: "In considering rights and obligations arising out of particular relations, it is competent for courts of justice to regard considerations of policy and convenience, and to draw from them such rules as will, in their practical application, best promote the safety and security of all parties concerned. This is, in truth, *the basis* on which *implied promises are raised*, being *duties legally inferred* from a consideration of what is best adapted to promote the benefit of all persons concerned, under given circumstances."

When, therefore, it is said, in this connection, that a servant assumes, by entering the service of his master, any given hazard, it is merely another form of saying that, under all the circumstances, the law imposes that hazard upon him. Remembering, then, that in this State it is held that the law does not impose upon the servant the risk as to the neglect of all the servants of his master engaged in the same general enterprise, but confines that risk to cases where he and the offending servant are, in a proper sense, *fellows*, it will readily be perceived that these general words are to be understood as applying to the cases in which they are used—applying to cases where this court holds that the law does impose the

hazard upon the servant. In other words, the servant, by engaging in the service, by an implied promise takes upon him all risks which the law imposes upon him, and no others; and these are not improperly called "ordinary risks," and embrace the exceptional negligence of careful servants who are his fellow servants within the law of this State, but do not embrace the acts of negligence of other servants of the same master who are not properly his fellows, although engaged in parts of the same general enterprise of the common master.

Accordingly, this court has in many cases held the master liable to the servant for damage caused by the neglect of another servant, although both were doing service contributing to the accomplishment of the same general enterprise.

In *Chicago and Alton Railroad Co.* v. *Shannon*, 43 Ill. 338, the injury was to a brakeman, from the bursting of a boiler, and the fault was the negligence of the foreman at the roundhouse in sending out an unsafe engine. The master was held liable.

In *Chicago and Northwestern Railroad Co.* v. *Swett*, 45 Ill. 197, the injury was to a fireman upon a locomotive, and was caused by the negligence of the track-repairers, in not keeping a bridge or culvert in proper repair; and the master was held responsible.

In *Schooner Norway* v. *Jensen*, 52 Ill. 373, the injury was to a sailor on the schooner, and was caused by the negligence of other servants of the same master, whose duty it was to see that the rigging and tackle of the vessel should not be sent out in bad order or in a defective condition. It was held, the action would lie.

In the case of *Illinois Central Railroad Co.* v. *Welch*, 52 Ill. 183, the injury was to a brakeman on a passing train, and was caused by the negligence of other servants of the company, in placing an awning at the station in dangerous proximity to the operatives on passing trains; and the action was sustained.

Where the injury was to a brakeman on a freight train, and was caused by the negligence of other servants of the same employer, having charge of the inspection and repair of cars, in permitting a car to go out on the road with a defective ladder, which defect was unknown to the brakeman, the common master was held liable. *Chicago and Northwestern Railroad Co.* v. *Jackson,* 55 Ill. 492.

Where the injury was to a fireman upon a passing train, and was caused by the negligence of other servants not connected with the running of the train, in negligently placing a "mail-catcher" too near to the track, it was held, the action would lie against the common master. *Chicago, Burlington and Quincy Railroad Co.* v. *Gregory,* 58 Ill. 272.

Where the injury was to a common laborer in a carpenter shop of a railroad company, near the railroad track, and the injury was caused by the negligence of the engineer in charge of a passing train of the same company, the common master was held liable. *Ryan* v. *Chicago and Northwestern Railroad Co.* 60 Ill. 171.

In the case of *Toledo, Peoria and Warsaw Railway Co.* v. *Conroy,* 61 Ill. 162, although the action was defeated on another ground, the court indorse the proposition that, where the injury was to a fireman, from defects in a railroad bridge, unknown to him, and which ought to have been known to other servants of the same employer, and the injury came through the negligence of the latter, an action will lie; and in this same case it was afterwards so adjudged. 68 Ill. 560.

In *Chicago and Northwestern Railroad Co.* v. *Taylor,* 69 Ill. 461, where the injury was to a station agent and switchman at a way-station, and was caused by the negligence of other servants of the company, whose duty it was to see that cars in passing trains should not go out upon the road without proper lights and proper brakes, the common master was held liable.

In *Illinois Central Railroad Co.* v. *Patterson,* 69 Ill. 650, it is laid down that an action will lie where the injury was to

an engineer of a passing train, and was caused by the negligence of other servants of the common master, whose duty it was to see that the railroad track was in good order, although that action was defeated by the negligence of the servant who suffered the injury.

Where the injury was to a switchman at a station, and resulted from the negligence in the car-inspectors in permitting a caboose to go out on the road with a draw-bar which was too short, the common master was made to answer to the injured servant.  *Toledo, Wabash and Western Railway Co.* v. *Fredericks,* 71 Ill. 294.

And where the servant injured was one of a party of track-repairers, whose ordinary duties were not at the station, and the injury occurred by reason of the negligence of an extra engineer, whose duty was to take arriving engines to the round-house, and while the party injured was temporarily engaged, by the express orders of his foreman, in ditching the track at the station, this court said that the rule which forbids a recovery by a servant for an injury resulting from the negligence of a fellow servant, did not apply.  *Pittsburg, Fort Wayne and Chicago Railway Co.* v. *Powers,* 74 Ill. 341.

Where a brakeman upon a freight train was injured through the negligence of other servants of the common master, whose duty it was to send out no cars save those which were safe, so far as could be ascertained, the common master was held liable. *Toledo, Wabash and Western Railway Co.* v. *Ingraham,* 77 Ill. 309.

In the case of *Toledo, Wabash and Western Railway Co.* v. *O'Connor,* 77 Ill. 391, the servant injured was a laborer employed as a track-repairer, on a section away from the station, and, at the time of the injury, was coming from his work, with his associates, over the main track, on a hand-car; and the injury was caused by the negligence of the engineer upon a passing locomotive, and this court held the common master liable.

So, where the injury was to an engineer by the explosion

of his engine, it was held that the engineer can not be re-
garded as a fellow servant with the servants of the same master,
whose duty was to inspect and keep in order its engines.
*Toledo, Wabash and Western Ry. Co.* v. *Moore,* 77 Ill. 217.

So, where the injury was to an engineer operating a train
on the railroad, and was caused by the negligence of the train
despatcher, whose duty it was to regulate the movement of
trains by telegraphic orders or otherwise, it was held that the
common master was answerable. *Chicago, Burlington and
Quincy Railroad Co.* v. *McLallen,* 84 Ill. 109.

It will be seen, by the cases cited, that in all the cases
wherein the right of action has been denied upon the ground
that the injured servant and the offending servant were fellow
servants, the facts show that they were brought into personal
consociation by their ordinary duties, or that at the time of the
injury they were actually co-operating in some particular work.
And it also appears that in the cases where the action has
been sustained no such relations existed. In the latter cases,
this court has said, they were not employed "in the same de-
partment of labor," and that the one is "not in the same line
of employment" with the other; and again, that they did
not "co-operate in the performance of their duties." And in
*Gregory's case, supra,* it is said that "one servant can recover
from a common master for the negligence of a fellow servant,
unless the latter is in the same line of employment." And
again : "The agents charged with that duty," (the duty of
properly locating the mail catcher,) "had no possible connec-
tion with running the trains." * * * "The duties were
as different and as distinct as those of a conductor and those
of a track repairer." In another case, by way of showing
that the relation of fellow servants proper did not exist, it is
said "neither could control the other or know of his want of
prudence;" and again, they "are not associated in the per-
formance of their duties." And in one case, *Ryan* v. *Rail-
way Co.* 60 Ill. 171, it is said that the reason for holding
against a right of recovery in certain cases of co-servants, is,

that for the safety of all each servant "in the same depart-
ment of business, should be interested in securing a faithful
and prudent discharge of duty by his fellow servants;" and
that each should be induced "to report to the master any
delinquency of those *engaged with him* in the performance of
duty." This reason, it is said, "can not apply where one ser-
vant is employed in a separate and disconnected branch of
the business from that of another servant;" and again it is
said "the object of the rule of exemption of the master is to
make each servant vigilant in seeing that the others are
careful and faithful;" and it is added, "where the reason of
the rule fails the application of the rule should cease."

Although the distinction taken by this court between these
two classes of co-servants has not the sanction of the courts
of England, nor that of most of the courts of last resort in
this country, we think on principle it is a distinction which
ought to be taken, and which logically springs from the true
reason (as already suggested) on which the common law rule
*respondeat superior*, rests,—upon the expediency of throwing
the risk upon those who can best guard against the dangers.

Had these considerations been constantly kept in view, in
all cases of injury to one of his servants by the fault of an-
other, it is believed the exemption of the master in such cases
would have been kept within reasonable bounds. If courts
had constantly had an eye to casting the hazard on those who
have the best means of preventing wrong, it is thought the
exemption would have been applied to cases where the
co-servants occupy such position in relation to each other as
to suggest that they could, in some way, contribute towards
guarding against the danger to be apprehended. This, how-
ever, being really a question as to what rule will best subserve
the great interests of society, it is perhaps not surprising that
courts of different States and different countries should have
differed in their judgment as to what rule on this subject
should govern.

The fact that no case can be found in the reports of judicial

proceedings prior to 1837, in which a master was ever sued by his servant for damage done to him by the neglect of another of his servants, and the fact that the first case of the kind in England was decided against the action, and the fact that the first case of the kind in America (decided, evidently, before the report of the English case was known to the bar or bench in South Carolina) was also decided against the action, (*Murray* v. *Railroad Co.* 1 McMullen's Reports, 385,) are very significant in showing that the action in cases of strictly fellow servants ought not to be sustained. On the other hand, it is true that what is here denominated the English rule on this question, has, in all its progress in the courts of England and America, encountered constant resistance by the bar and many of our ablest jurists; and that the reasons assigned in its support by the courts adopting it have been deemed inadequate and illogical, and have not been found in harmony with each other. These facts are significant in suggesting that that rule has not generally been placed on its true foundation, and has generally been carried too far. Upon the whole, we see no sufficient reason to depart from the rule indicated by the decisions in our own State, and can not do so in this case.

The judgment in this case must be reversed, and the cause remanded for a new trial in consonance with the views herein expressed

*Judgment reversed.*

Mr. JUSTICE SHELDON dissents upon the second branch of the opinion.