# THE CONSOLIDATED COAL COMPANY OF ST. LOUIS

## v.

# RICHARD SCHELLER.

*Master and Servant—Negligence of Master—Personal Injuries—Latent Defect—Props—Sec. 16, Chap. 93, R. S.—Fellow-Servants—Notice from Lapse of Time.*

1. Where a master provides or prepares the place in which his servant is to work, the law does not make him a guarantor of its safety. It requires of him only the exercise of reasonable or ordinary care to have and keep it reasonably fit for the use to which it is put.

2. If he exercises this care in selecting or ordering the material required, and in employing competent persons to construct or prepare the place, and there is no obvious defect of plan, material or work, he will not be liable for an injury to the servant resulting from any that is latent.

3. Sec. 16, Chap. 93, R. S., implies that where no timberman is employed, it is the duty of miners, and a part of their employment, to carefully observe the roof under which they are working, from day to day, and to set props wherever they appear to be needed.

4. Where a timberman is employed, miners are not thereby relieved of the duty of observing the conditions, and promptly reporting to the mine manager or timberman any signs of danger they may discover which require his services.

5. While after an accident has occurred it may be easy to see what would have prevented it, that, of itself, does not prove nor tend to prove that reasonable or ordinary care would have anticipated and provided against it.

6. Mine owners in this State are under no statutory obligation to absolutely keep the roof of a mine so propped that it will not fall.

7. Where a personal injury to a servant is the result of the negligence of fellow-servants, the master is not liable unless some preceding personal negligence on his part also led directly to it as a cause.

8. The employment of a timberman in a mine is not an exception to the rule that servants in a given employment assume all risk of injury arising from the negligence of fellow-servants.

9. An employer is not bound to give his servant notice of " the ordinary dangers pertaining to the particular service," for the reason that all persons engaged in it are presumed to know them.

10. In the case presented, this court holds that in failing to discover, before the accident in question, the dangerous condition from which it resulted, defendant did not fall short of the measure of its duty to the plaintiff.

[Opinion filed January 30, 1892.]

APPEAL from the Circuit Court of Macoupin County; the Hon. JACOB FOUKE, Judge, presiding.

Mr. CHARLES W. THOMAS, for appellant.

Messrs. GEORGE L. ZINK and JAMES M. TRUITT, for appellee.

PLEASANTS, J. October 3, 1888, appellee, then about twenty years of age, was employed to work in appellant's coal mine No. 8, at Mt. Olive, as a loader, to push the empty boxes from the entry to the face, load them there and push them back to the entry to be hauled to the pit bottom. He had worked two years in the mines there as a loader and laborer, but not any during the two next preceding. In the morning of the day mentioned the pit boss directed him to go into the mines, the time keeper told him the driver would show him the room, and the driver showed him to No. 14, where he had never before been. He had worked for little more than an hour, having loaded two boxes, and while pushing in the third, about forty feet from the face, a mass of slate weighing from six to eight hundred pounds, becoming detached from the roof, fell upon him. For the injury thus received he brought this action, and recovered judgment on a verdict, which the court refused to set aside, for $12,000.

It appears that the width of the room at that place was about thirty-six feet, and its height from seven to eight; the width of the track was two feet or a trifle over, and of the boxes three and a half to four.    On each side of the track was a row of props supporting the roof and extending to a point twelve or fourteen feet from the face.    These rows were variously stated to have been from six to nine feet apart, the more reliable evidence, as we think, placing them at about seven, leaving room to get around the boxes without obstruction from the props.    These were placed in each row, at the usual distance apart of five feet, by Charles Opp, a timberman specially employed by appellant for that work in the mine.

The mass that fell upon appellee was what is called a slip; of which a clear idea from the testimony is given by appellee's counsel as a " formation of slate around a pot, bulge or tit projecting downward from the roof.    At the bulge the slate runs to a feather edge, which first becomes loosened from the rock above, and this causes the slate to gradually droop down, commencing at the bulge, until finally the loosened feather edged end becomes so heavy that the piece breaks off and falls to the floor below."    Mr. Rollo, the manager of the mine at that time, says the piece that fell " formed a smooth skin over a tit of bulging rock; " that it thinned toward the road, and feathered out a little over it; from which it would appear to have been feather edged at both ends, making a smooth surface, but still (as one of the witnesses says of slips generally) something of " a hump that is lower than the rest of the roof." The piece was about four by five feet on the surface, and wholly between the props on the right side of the track approaching the face.    Its fall disturbed neither of them.    The probability seems to be that it became detached first at the bulge end, which was furthest, swung down and fell on that end leaning toward the track.    Appellee was found on the right rail, " caught from his feet up to his arms."

From his own testimony it appears that he " knew the roof of that mine was liable to fall in sometimes;" that " men got hurt in that mine, but didn't know whether it was by slate or not."    He did not know, nor was he ever informed that the

roof was dangerous at the place where he was hurt; nor did he look to see whether it was. He had sounded the roof where he had loaded, and found what he thought was a dangerous place on the right side by the face, but did not sound it at the place where he was hurt.

Whether appellant or any representative of it, before the accident, had actual knowledge or were informed of the character and condition of the roof at that place, is to be determined from the circumstances and the positive testimony following:

Adolph Scheller, a cousin of appellee, who was then working in mine No. 8, and had been for two years, says: "I know the place where Richard was hurt. I was not there at the time; I was in about half an hour before, that morning, but heard the roof cracking and came out; I did not tell anybody about it."

Frank Sautner, a miner, says: "I was at work chuting coal in this mine where Richard was hurt; was at work when he got hurt. I worked sometimes in the morning in there; was there the day before, and the day before that. I worked in there more than two weeks. That slate was loose about two weeks—long before he got hurt. I saw it and watched it so that I would not be caught. I heard it sometimes; sometimes it would sway down. * * * I knew there was a slip along the roadway, and so did almost every one that works in there. * * * Some loaders that worked in there knew the place. I don't know whether Opp knew it or not."

These were all the witnesses produced by plaintiff to that point, except Paul Daler, who was at work in that mine at the time of the accident and had been for seven or eight months. He was shoveling for the machine, in the same entry with plaintiff. He says: "The day before plaintiff was hurt our attention was called to the fact that the slate was loose there by a runner. I didn't see anything, only he said so;" and that "he did not tell the plaintiff nor the timberman." The court excluded the hearsay.

Thus it appeared that of the many persons who must have been at and about the place during the fortnight preceding

the accident and interested in the condition of the roof, appellee produced only three; that of these only two had personal knowledge of anything indicative of special danger there, of whom one was apprised of it only by hearing the roof cracking, and that only half an hour before it fell, and one by seeing and hearing; and neither, before the accident, gave any information of what he had seen or heard.

The defendant introduced the following:

Bruno Hensler, who had known the mine ever since it was sunk and had just got out when plaintiff was hurt: "The slip looked kind o' bad, but I couldn't say it was bad.  *  *  *  The slip was on the right hand of the road, about two feet from the road.   It fell on the road because it must have got loose on the other side first, and slipped right over the road.   The slip didn't look extra dangerous over the road, but it did about three feet from the road."

John Lawson: "Am a butcher now.   Was a miner before, for about twenty-five years.   Was working at No. 8, assisting Mr. Rollo at the time that Scheller was hurt.   Was not in the room at the time of the accident.  *  *  *  I had been in and out of this room every day with very few exceptions.   I noticed no danger on the road in my rounds.   Knew the bulge was there, but that was off the road, between the props and the rib" (which is the pillar of coal left in mining, to support the roof). "Noticed no dangerous place between the rows of props.   I saw the bulge, knew there was a slip there.   The bulge was three feet or so from the right rail.   There was a row of props between the bulge and the road.   The slate that broke was not over the road."

Charles Opp: "I have been a coal miner eight years. Have worked in Mt. Olive at No. 8 and 10—been timberman since last January, 1888.   I understand the business of timberman.   I put the props in room 14.  *  *  *  The slip looked level.   Could not see that it was a slip from below.  *  *  * I did not know the slip was there, or I would have taken it down.  *  *  *  On one side the props were nearer the road than on the other.   They were not five feet from the road on one side.   They were sometimes near two feet from the road,

sometimes a foot. Can't say how far they were from the road at the place where the accident occurred. I knew it was a bad place. It was not a dangerous place."

John Rollo: " I was mine manager of No. 8 when Scheller was hurt. Have been a coal miner twenty-eight years. * * * The slate that fell on him formed a smooth skin over a tit of bulging rock and then thinned out to a feather edge. That's what is meant by a slip. Had not been in the mine that morning before the accident. Was in the mine every day. Did not always go down before the men. I sometimes did. I never allowed them to go to a place which was considered unsafe. Did not always go down to see if there was any unsafe places. We had men working there all night, and the boss of the night force, John Mills I believe, reported the condition of the mine in the morning. I think he made an examination that morning. He made a report in person. I had the report before I sent them down. I had the report that morning. If the mine was ever considered unsafe I would never send them down."

If the slate that fell was previously known to Rollo or to Lawson, his assistant, to be actually " loosened, detached and broken from the surrounding parts " of the roof, which was the dangerous condition alleged, they were miners of sufficient experience and intelligence to know it was dangerous. This statement that they did not know it, is therefore, in effect, a statement that they did not know nor were informed of the particular condition described. This was not contradicted by any like testimony, nor inconsistent with any circumstances shown. There is, then, no sufficient evidence that the company had actual notice of the dangerous · condition alleged. Nor, if it was an issue properly in the case, do we find any sufficient to prove that this actual ignorance was itself due to negligence on its part.

Where the master provides or prepares the place in which the servant is to work, the law does not make him a guarantor of its safety. It requires of him only the exercise of reasonable or ordinary care to have and keep it reasonably fit for the use to which it is put. Cooley on Torts, 550–1, and notes;

Consolidated Coal Co. of St. Louis v. Scheller.

Pantzar v. Iron Mining Co., 99 N. Y., 368; Warner v. Erie Railway Co., 39 N. Y. (12 Tiffany) 468; Ryan v. Fowler, 24 N. Y. 410; Ladd v. New Bedford R. R. Co., 119 Mass. 412; Cooper v. Hamilton Mfg. Co., 14 Allen, 193; Malone v. Hawley, 46 Cal. 409; Brown v. Accrington Cotton Co., 3 H. & C. (Exch.) 511.

It is the same degree of care required in respect to machinery, tools and appliances provided by the master for use by the servant. Cooley on Torts, *ubi supra*, and also p. 557 and note 1, citing, besides other Illinois cases, Camp Point Mfg. Co. v. Ballou, 71 Ill. 417. And the same as to the competency of fellow-servants employed. C. C. & I. C. Ry. Co. v. Troesch, 68 Ill. 545.

If he exercises this care in selecting or ordering the material required, and in employing competent persons to construct or prepare the place, and there is no obvious defect of plan, material or work, he will not be liable for an injury to the servant resulting from any that is latent. In Warner v. The Erie R. R. Co., *supra*, the baggageman, while in the discharge of his duty, was killed by the fall of one of defendant's bridges. It was conceded that it was originally well constructed and of sufficient strength, but fell from decay in its timbers; and it appeared that the company employed competent persons to supervise and inspect its road bed and bridges, who made frequent observations, and applied the usual tests without discovering any imperfection or decay, nor was any visible upon outward inspection. It was held that the company had exercised all the care that the law required with reference to the safety of its employe. The court declared "ordinary care and diligence" to be "the measure of its obligation" in such a case. In Cooper v. Hamilton Mfg. Co., *supra*, which was an action brought by an employe for an injury sustained while aiding others in removing a heavy machine into a room by trucks, one wheel of which broke through the floor and thus led to the injury, the court say the defendants were required "to use proper care in order to see that the floors were of sufficient strength to support any machine which it was necessary to move over

and upon them. But the nature of this care which they were bound to use was such that the defendants might have performed their full, legal duty by employing suitable persons of competent skill and experience, whose business it was to keep the floors in such condition as to repairs that they were fit and safe for use for any of the purposes for which it might become necessary to appropriate them. If they were diligent and careful to this extent, and any want of repairs had not existed for so long a time as to show absolute negligence on the part of defendants, the accident would have been attributable to the negligence of an agent or servant in the service of a common employer with the plaintiff." In Brown v. The Accrington Cotton Co., *supra*, the defendants, a co-operative company of cotton spinners, in 1862 commenced building a mill according to plans and specifications prepared for them. The work was done by contract with different persons for the several parts thereof, and defendants appointed one Dean as clerk of the works, to superintend the building and see that the contracts were performed. A part of the mill consisted of a building, originally intended to be two stories high, with one fire proof floor and a fire proof roof, and to rest upon ashlar foundations. Dean directed rubble to be substituted for this ashlar, and two other stories to be added to the building, which was completed with three fire proof stories and one wooden story. Each of the floors was supported upon arches springing from iron girders supported in the center by iron pillars. All the outside work was completed and the building covered in November, 1862, and in March, 1863, while plaintiff, who was employed by Dean, was working in the third story, the floor fell, and he sustained the injury for which the action was brought. It did not distinctly appear what was the immediate cause of the accident, but there was evidence that the arches of the floor, which ought to have been segmental, did not rise regularly, but were too flat at the bottom; that three of the pillars were put up not quite plumb, and they were shifted, and that the rubble foundations were not sufficient to support the additional weight put upon them. There was no evidence that the defendants ever inter-

fered in any manner with the building. Plaintiff recovered judgment on a verdict for £500. After full discussion and consideration the court in banc made the rule absolute to enter a nonsuit, and Pollock, C. B., announced their judgment as " founded on this, that there was no evidence of personal negligence on the part of the company or any of the members of it; nor was it shown that there was negligence on the part of any person acting as their servant or under their orders, for which they are responsible, either by having given specific directions as to the mode in which the work should be done, or by having any reason to suppose that the person to whom they intrusted the duty of seeing that it was properly performed, was not a person of ordinary competence."

The only cases cited by counsel as in support of their contention for any higher degree of care, as obligatory on the employer in favor of the employe, are those of Pantzar v. The Iron Mining Co., and Ryan v. Fowler, *supra;* Coombs v. New Bedford Cordage Co., 102 Mass. 572 ; Hall v. Johnson, L. J. Ex. 222; Troughear v. Lower Vein Coal Co., 62 Ia. 576 ; Quincy Coal Co. v. Hood, 77 Ill. 68 ; Kelley v. Wilson, 21 Ill. App. 141, and The Consolidated Coal Co. v. Wombacher, 134 Ill. 57. We do not find that either of these lends any support whatever to that contention. On the contrary, every one of them either expressly declares or distinctly recognizes the extent of that duty to be the exercise of reasonable or ordinary care to have the place reasonably safe and fit for its use. In neither, excepting possibly the English case, was an absolute duty to have it so claimed, but the right of recovery was put upon the allegation of actual notice to the employer of the dangerous condition which led to the injury, and of personal negligence in respect to it; and where the verdict for plaintiff was sustained, it was sustained upon evidence deemed sufficient to support those allegations. We have not examined the report of the English case, because the extract from the opinion quoted in the brief is sufficient and conclusive of the point. There, the plaintiff, a laborer in defendant's mine, was injured by the fall of a stone from its roof. He had given the "underlooker,"

whom we take to have been what is here known as timberman, full notice that a prop to the roof was wanted, and the injury was caused by his delaying for a day to prop it. The court say: "The question for us is, whether, under the circumstances, the defendants are answerable for the negligence of the underlooker. There is no evidence at all to show that the defendants had been guilty of any want of proper care in the selection of the underlooker. * * * Upon these facts we think the position is not tenable that the defendant, the owner of the mine, is responsible for the negligence of the under-looker. We have come to the conclusion that the underlooker, who had to see to the mining operations in this part of the mine, and the plaintiff, were fellow-laborers." Manifestly, if the master had been absolutely bound to keep the roof safe, no such question could have arisen; the negligence of a fellow-servant would have been no defense. The duty here recognized was held to have been performed to its full extent by the exercise of proper care in the selection of the underlooker, though he proved to be a negligent one.

The Supreme Court of Illinois, speaking by a judge habitually positive in his views and strong in his expression, has declared the duty of railroad companies to protect employes on their trains against injury from defective construction and appliances, putting them in this respect substantially on the footing of passengers, in stronger terms, though holding that they are not insurers. T. P. & W. Ry. Co. v. Conroy, 68 Ill. 560; C. & A. R. R. Co. v. Platt, 89 Ill. 141. And there seems to be some ground for a distinction between such employes and those who work in a fixed place.

As to the latter the authorities are agreed that reasonable or ordinary care, under all the circumstances, is the extent of that duty. In one case a very high degree of care would be no more than reasonable or ordinary, and in another a much lower degree would be no less. These circumstances include the position of the respective parties. Thus in Warner v. Erie Railway Co., *supra*, the court said that "the care and diligence which the directors were required to bestow, was that reasonable care, skill and foresight over the affairs of the corpora-

Consolidated Coal Co. of St. Louis v. Scheller.

tion, which reasonable and prudent men *occupying such positions* ordinarily exercise under the same circumstances," and proceeded to show and to hold that the master does not impliedly contract with his servant, nor is required by the law, in person, to give his attention to all the details of the work and its actual condition from day to day. In many cases it would be impracticable, and as to many of such details he would not be competent, for want of skill, knowledge or judgment, to do so with safety to the servant. As to these, therefore, he may properly rely upon others, selected with due care, and provided with the requisite materials and appliances also thus selected or ordered. And having done that, he is not chargeable, without sufficient proof that he or his representative had actual notice, or under the circumstances ought to have known, of the dangerous condition or the incompetency of the fellow-servant to which the injury is immediately attributable.

Now in determining what ordinary or reasonable care demanded of the company under the circumstances of this case, it should be borne in mind that here the co-employes of appellant had much to do directly with the preparation of the place of his and their work, and with all that was necessary to maintain it in proper condition. We may take judicial notice of the fact that the veins of coal in this vicinity are overlaid immediately by a stratum of slate or rock, which constitutes the roof provided, not by the master but by nature, under which those employed in the mine must work. The master can not choose between that roof so provided and some other to be constructed by himself, and that is fully known to the workmen there employed. The overlying stratum is not uniform in consistency, thickness or strength. To make it safe as a roof, props and other artificial appliances are necessary. Miners become, by experience and interest, competent, if not the best, judges of the character and condition of this natural roof at given places, and of the extent to which it needs artifical support. Where no timberman is employed we understand it to be the duty of the miners, a part of their employment, to carefully observe the roof under which they are working from day

to day, and to set props wherever they appear to be needed. This is implied by the statute, which requires the operators of coal mines to " keep a supply of timber constantly on hand, of sufficient length and dimensions to be used as props and cap pieces, and deliver the same as required, with the miner's empty car, so that the workmen may at all times be able to secure said workings for their own safety." Sec. 16, Chap. 93, R. S.

Where a timberman is employed, and the miners are thereby relieved of the duty and labor of setting props, as may be conceded was the case here, they are not also thereby relieved of the duty of observing the conditions, and promptly reporting to the mine manager or timberman any signs of danger they may discover which require his services. If any such presumption should arise it was here fully rebutted by the fact in evidence that the appellant had printed, framed and hung up at the mine, rules for the government of employes, one copy of which was posted at the top of the shaft where the men went down, and one in the engine room, including the two following:

" Loaders will examine the roof and face of coal before commencing work in each room or entry, and during the progress of their work. In the event of the same being unsafe or becoming unsafe, they will at once cease work and notify the timberman or mine manager.

" It shall be the duty of every miner employed in the mine to examine the roof or other overhanging slate, rock or top coal in his working place, as soon as he shall enter the same in the morning. If found unsafe he shall immediately take down or prop up the loose material, and see that it is in safe condition to work under before commencing work."

Upon appellee's statement that he had not in fact read these rules, nor had his attention called to them, the jury were instructed that he was not bound by that particular expression of the company's will; but without that expression he had sufficient intelligence and experience in the mine to know these duties. They were imposed by the conditions and dangers well known to be incident to the service, and being due to themselves as well as to the company, it had the more

right to expect of all the employes mentioned, a careful observance of them. We are not here considering, however, nor raising any question of negligence on his part, but of reasonable care on that of the company. If he was too recently employed to be expected to observe and report so soon, the loaders preceding him were not. They and the miners may be presumed to have known these rules and accepted the duties therein stated. They were already in force, and must have been understood. The formulated rules only expressed and emphasized them. In this mine the coal was all dug by a machine, which cut five or six feet per day. If steadily operated during the two weeks that Sautner said this slate was loose, when he first observed it the face must have been very near the place where it fell. The coal dug in the meantime had been dug and loaded by somebody. The timberman had followed the machine, set the props and laid the rails. The miners and loaders had been constantly passing back and forth under the roof so propped; and yet, though thus charged with this duty, and so interested to perform it, none of them reported any sign of danger to the timberman or mine manager. Their only reasonable excuse must be that though they looked for such they discovered none. If this slate was loose for more than half an hour before it fell, Sautner alone, of so many having equal means of knowledge and like interest to know it, did know it, and he gave no information of it.

It appears that some time from ten days to a fortnight before the accident some slate near that place did fall, but it was outside of the line of props, where nobody had further occasion to go. It was on the outer side of the bulge, and its fall, as Hensler states, "left the slip smooth on one side," the one toward the road, and that it "didn't look extra dangerous over the road." Rollo says: "The slate that fell on him formed a smooth skin over a tit of bulging rock, and then thinned out to a feather edge." Opp says, "the slip looked level. Could not see that it was a slip from below. I did not know the slip was there."

These statements were not contradicted, and this smooth

and level appearance must account for the failure of the
employes to observe and report any sign of special danger
there.    It may well be, also, that what Sautner saw and heard
indicative of looseness, if anything, was of the piece that fell
before the accident, and that he regarded the danger to him-
self from it as no more than a possibility.    That would account
for his neglect to give information of it; for he says that
" when anybody saw any slate loose or that the roof was bad,
he sent word to the timberman, and then it was his duty to
go and fix it."    If he meant that the condition of the roof
seriously threatened anybody between the rows of props, his
silence about it shows either the petty vanity of affecting, after
the event, to have known before it more than he really did, or
a morally criminal indifference to the peril of his fellows; and
charity would rather infer the former, since he did not cer-
tainly identify the piece that was loose, nor definitely fix the
place where the crack or detachment appeared.    But be that
as it may, he alone knew it, so far as appears, and so the fault
of appellant's representatives in not discovering it, if any, was
not shown to have been greater, their care and diligence any
less, than that of all the other employes who also had a like
or greater interest and equal or better opportunity but failed
to discover it; which would fairly warrant the inference that
it was at least no less than ordinary.

No question is made of the competency of the mine man-
ager or pit boss, or his assistant, nor of their faithfulness,
except in this instance.    They were practical miners of large
experience.    They went through the rooms and entries daily,
observing and doing, for aught that appears, just what those
in such positions ordinarily do.    The timberman understood
his business, and it would hardly do for appellee, in the face
of the rulings in Hall v. Johnston, and Troughear v. Lower
Vein Coal Co., to attribute the injury to negligence on his
part.    He followed the miners and propped the roof to their
satisfaction.    To all appearance, as presented to men con-
stantly passing under it, skilled in judgment as to its natural
condition and the sufficiency of its artificial supports, aware of
the dangers to themselves from defects in either, in duty

bound to look carefully for them and expressly enjoined to perform it, it was "well propped" and of sufficient strength. They reported no defect. The company had no actual notice of any, nor was there any so patent as to attract attention in the course of such usual observation as is shown to have been ordered and made.

After an accident has occurred it may be easy to see what would have prevented it; but that, of itself, does not prove nor tend to prove that reasonable or ordinary care would have anticipated and provided against it.

We have considered the importance of this case to the parties and others a sufficient excuse for the statement at such length of the material facts bearing upon this point, which are undisputed, and of the material evidence relating to such as are not. In the light of the authorities examined we think it does not fairly support a finding that in failing to discover, before the accident, the dangerous condition from which it resulted, appellant personally fell short of the measure of its legal duty to appellee. If there was any negligence in reference to it, that is, any want of reasonable or ordinary care, which is not intended to be intimated, the evidence would tend rather to show it to have been that of others, for whose negligence appellant was not responsible to appellee. If Opp knew the condition of the roof, either by his own observation or by report, he was under a general and express order of appellant immediately to make it safe; which order he was fully competent to execute. If he did not, but Santner, or any miner or loader or other employe in the mine did, it was his duty immediately to report it. If the manager knew it, either by his own observation or by report, ordinary care would have required of him no more than to make it known to Opp and give him a special order in reference to it. He would not have been bound or expected to stand by the timberman while he propped or took down the loosened matter. Other duties might have forbidden it. And in that case the special order would have been no more a discharge of his duty than was the general order in case the timberman had come to know it in any other way. If nobody knew

it and the fact was so patent and for so long a time that it ought to have been known, the negligence was still rather to be charged against the employes, whose special duty it was to look out for these dangerous conditions, than to the company which had employed them for that purpose, if it used reasonable care to see that they were fit to be so employed.

We believe that all these co-employes who had to do with the same coal, room and roadway, were in fact fellow-servants. They were made such by the relation which the work of each bore to that of the others, necessarily bringing them into the habitual association that distinguishes fellow-servants from other co-employes. And we understand that this personal relation arises upon the instant of their actual engagement in the work so related; that he who holds the drill and he who wields the sledge are fellow-servants when the first blow is struck, though they may never have met before. Hence we hold that if appellee's injury is attributable to negligence of any of these co-employes, appellant is not liable therefor unless some preceding personal negligence on its part also led directly to it as a cause.

We have intimated a doubt whether negligence on its part in failing to discover, before it fell, that the condition of the roof at that place was dangerous, was really an issue in this case. Such negligence, as a distinct and material element of the cause of action, must have consisted in the failure to exercise that degree of care, whatever it may be, which its duty required, in order to discover it; and the duty to exercise any degree, even the highest known to the law, necessarily implies that its full performance would exonerate the company from liability for the injury, though it failed to discover the danger. In other words, it implies that the roof might have fallen and inflicted the injury notwithstanding the company's performance of its duty to its fullest extent. Had its duty been absolute to prevent the roof from falling, then its fall would make the question of appellant's care to discover the danger wholly immaterial.

But we understand the only causes of action alleged are, first, the non-performance of an absolute duty to prevent the

roof from falling, and second, the non-performance of the duty to give appellee notice of the danger, a duty alleged to have arisen, as only it could arise, from the fact that appellant had actual notice of it; in either of which cases the question of negligence referred to would be wholly immaterial.

The declaration, as originally filed, contained six counts. Each of the first three charged that the defendant wilfully failed to perform an alleged statutory duty, absolutely to keep the roof so propped that it would not fall. These the court, being of opinion that there was no such duty so imposed upon the defendant, instructed the jury to disregard; of which instruction appellee makes no complaint. It seems to have been held in the case of this appellant v. Yung, 24 Ill. App. 255, that there was no statute imposing such a duty, and with that opinion we concur. None such is known to us.

The fourth count, which originally alleged that duty as existing, without stating the origin or ground of it, was amended, after the evidence was all in, so as to read as follows (the amendment consisting in the insertion of the words in italics): "And for that, whereas, the defendant afterward, to wit, on the third day of October, A. D. 1888, was possessed of and used and operated a certain other coal mine at Mt. Olive, *to wit*, at the county aforesaid. And the plaintiff further avers *that the defendant then and there assumed, wherefore* it then and there became and was the duty of the defendant to keep and maintain the roof of said mine in such condition that the same was (would be) safe and secure for miners engaged in said mine to work under said roof with safety to themselves. And the plaintiff further avers that on the day and year aforesaid the defendant, disregarding its said duty, suffered and permitted the roof of a part of said mine to become unsafe and insecure by reason of the same becoming detached, loosened and broken from the surrounding parts of said roof, of all which the defendant had notice, and that the plaintiff was then and there employed by the defendant to mine coal in said mine, and that in the discharge of his duty as such miner the plaintiff was compelled to pass under said part of said roof, so detached, loosened, broken, unsafe and insecure as

aforesaid, and that on the day and year aforesaid, while plaintiff was under said part of said roof, so unsafe and insecure as aforesaid, discharging his duty with due care and caution, said part of said roof, so detached, loosened, broken, unsafe and insecure as aforesaid, fell down and upon the plaintiff with great force and violence, whereby and by reason whereof the plaintiff became and was greatly crushed," etc.

The duty of the defendant is not here alleged to have been to use reasonable or ordinary care, nor any higher degree of care to make and keep the roof safe, but absolutely " to keep and maintain it in such condition that the same was safe and secure for the miners to work under with safety to themselves."

It should be observed also, that the court does not aver that the defendant "negligently" suffered the roof to become unsafe, as is usual in counts for negligence, which is the failure to use the proper degree of care, but that " disregarding its said duty it suffered and permitted " it. The averment that of the unsafe condition alleged it " had notice," which is not by this count made the ground of action or an element of it, would seem to be useless except to show that this disregard of duty was wilful.

The alleged ground of this extraordinary duty is that the defendant " assumed" it. Such assumption is a conclusion. Had the facts relied on as constituting it been stated, this count also should have been disposed of without troubling the jury. For, as it turned out, those facts were that the defendant employed a timberman, whose duty was or included the putting in of props, and that he did put in all that were put in on that roadway. The idea that these facts constituted, implied or tended to prove an absolute guaranty to its other employes, that during his employment they should never be injured by a falling of the roof without their fault, is, in our judgment, entirely groundless. A guaranty of the end would be a guaranty of all the necessary means—in this case, that Opp should observe or be informed of every dangerous place in the roof upon the instant of its becoming so, however latent, should always be then at hand, should judge

rightly as to the need and sufficiency of the prop or other means of averting the danger, and apply it in good time. This would be clearly beyond the power of any man. The company could have agreed to be absolutely liable for all the damages resulting from such injuries, if it had seen fit so to do; which, though very extraordinary, would have been quite a different thing from guaranteeing that none such should occur. But it did neither by the mere employment of a timberman. We understand that where no timberman is employed, the duty of propping is devolved upon the miners by virtue of their employment. It is an indispensable operation in mining. Somebody must do it, and be employed to do it. Whoever that may be, the "assumption" by the company is by such employment precisely the same as by the employment of a timberman. Hence, upon the reasoning of counsel, the company could never be exempt from liability for an injury to a servant caused by the negligence of a fellow-servant, the simple employment of the latter being an absolute assumption by the master of the performance of his particular duty without negligence. Clearly there is no such assumption by such employment. The servant does not represent the master to his fellow-servants. Here the company employed Opp to do his proper work, just as it employed the miners, loaders, engineer and others to do theirs, respectively, hoping and expecting that each would do his own without negligence, but by no means guaranteeing or assuming, in favor of the others, that he should. Each assumed all the risk of injury through the negligence of his fellows; that the employment of a timberman is not an exception, is expressly decided in Hall v. Johnston, and Troughear v. Lower Vein Coal Co., *supra*, and the proposition contended for is plainly negatived by the rule exempting the master from liability above referred to and by the cases which declare it. We therefore find no evidence whatever tending to prove the alleged assumption.

The fifth count, after stating the possession and operation of the mine by defendant, proceeds as follows: "And the plaintiff avers that it then and there became and was

the duty of the said defendant to keep the roof of said mine so secured by props, cross-bars or other appliances, as to prevent the same from falling or tumbling down upon the persons engaged in operating said mine. And the plaintiff further avers that the defendant, disregarding its said duty, failed and neglected to so secure a part of said roof by props, cross-bars or other appliances, as to prevent the same from falling or tumbling down upon persons engaged in operating said mine, of all of which the defendant then and there had notice." It then states that plaintiff was employed to mine coal in said mine, and that in discharging his duty he was compelled to pass under the unsafe part, and that while so doing, and acting with due care, it fell upon him.

Here also the defendant's duty to keep the roof in safe condition, by means of props or otherwise, seems to be alleged as absolute, and the failure to do so is the negligence charged, without regard to the degree of care that may have been used to keep it so. That of which it had notice as stated was the alleged duty and the failure to perform it, which it certainly had after the roof fell, if the duty was absolute to prevent its falling. Notice of its condition, before it fell, is not averred, whatever may have been intended; nor was it intended to be averred as an element of the cause of action, as we understand the count. If there was any definite purpose in it, we should think it was, as in the fourth count, to show a wilful disregard of the duty. It differs from the fourth in that it fails to state any ground on which the alleged duty is claimed to have rested, or any circumstances out of which it is claimed to have arisen, unless it be the fact that it owned and operated the mine. If it existed, it must have been imposed by some law, statute or common, or arisen out of some special circumstance which could have been stated. We are as unadvised of any statute imposing it, as was the court in the case of this appellant v. Yung, 24 Ill. App. 255. The authorities above cited abundantly show that the common law did not impose it; nor did it arise out of the fact of ownership and operation of the mine; for they hold the owners and operators bound to use only reasonable or ordinary care. And

Consolidated Coal Co. of St. Louis v. Scheller.

treating this count with the same liberality shown to the fourth, as stating a cause of action, although defectively, we fail to find in the evidence any proof of any special circumstance to supply the defect in the statement. There being then, in our judgment, no evidence tending to prove the duty we understand to be here alleged, there could be none tending to prove a breach of it.

The sixth count averred that the roof of a part of said mine "was unsafe and insecure by reason of the same becoming detached, loosened and broken from the surrounding parts;" that the defendant "had notice" of that fact; that "it was the duty of the defendant to give the plaintiff notice of all the dangers of said service of which the defendant had notice;" that "the defendant wholly neglected and disregarded its said duty and did not give the plaintiff notice of the unsafe and insecure condition of said part of the roof of said mine," but on the contrary thereof ordered him to commence working in such part of said mine; that he was compelled to pass under said part of said roof, and that while so passing in the discharge of his duty, with due care and without notice of its said condition, it fell down and upon him.

The company was not bound to give him notice of "the ordinary dangers pertaining to the particular service," for the reason that all persons engaged in it are presumed to know them. U. S. Rolling Stock Co. v. Wilder, 116 Ill. 110. We suppose that the danger of parts of the roof being or becoming loose and falling is among them; and appellee certainly knew of that, as he showed by sounding this, and admitted it.

The averment here must therefore be understood as referring, not to ordinary dangers from the roof liable to arise or actually existing though not developed or apparent, but to the particular place where the slate fell on him and its condition as already "loosened, detached and broken from the surrounding parts." The wrong charged is that defendant neglected to give him notice of that particular condition at that particular place; and the kind of notice intended is particular and

actual notice. Immediately upon his employment he was sent to work where he would pass under this place, and no other notice could certainly have protected him. The duty of giving it is predicated upon the allegation that it had it. Because it actually knew of this condition and plaintiff did not, its duty was to give it, and the breach alleged is that it did not give it. This is distinctly and substantially different, as respects both the duty and its breach, from an averment that it should have known it and failed to use ordinary care to ascertain it, though the liability may be the same. Admitting this to be the true construction of the count, counsel with great confidence reiterate the assertion that the company did actually know it. But they refer to no evidence of such knowledge except that which tended to show that the condition had existed for two weeks before the accident; from which they say, not that the company should, but that it "must" have known it, an inference which is certainly not a necessary one. We have seen that nobody, whose duty would have required him to report it, if he knew it, is shown to have known it, except Sautner, and he says he did not report it. That fact material'y distinguishes the case from that of C. & E. I. R. R. Co. v. Rung, 104 Ill. 641, cited by counsel. The assertion that Opp knew it is unsupported by any particle of direct evidence, and directly against his explicit and positive statement. Besides, his duty, if he knew it, would not have been to report it, but to remedy it. He was not the company nor in any sense its representative, but its servant, a servant of servants, and subject to the call, among others, of appellee himself. If it be said that others knew there was a slip along the roadway, the answer is, that is not the dangerous condition alleged. Throughout the declaration it is stated to be that this part of the roof was "loosened, detached and broken from the surrounding parts." There is no pretense that any such condition was reported to the manager or his assistant, and they swear in effect that they had no actual notice of it.

It is true that the Supreme Court has often said, nor do we deny, that the question of notice from lapse of time is for the jury (City of Chicago v. Fowler, 60 Ill. 322), and that notice

of a defect or obstruction will be presumed after the lapse of sufficient time. City of Springfield v. Doyle, 76 Ill. 202; C. & I. R. R. Co. v. Russell, 91 Ill. 298. Generally this has been said in cases where the issue was upon the averment of negligently leaving a defect unrepaired or an obstruction unremoved, which is as well proved by a want of due care to know of such defect or obstruction as by failure to remedy or remove it when actually known. Each is within the scope of the averment, and when the jury find from the lapse of time that the party charged either did know or ought to have known, it is unnecessary for them to determine which, and we apprehend that the law does not. In holding the failure to know, under such circumstances, to be evidence of a breach of duty, it of course implies that there may be such failure in fact; in other words, that lapse of time is not conclusive evidence of actual notice. Then it can not be conclusive where the issue is upon the averment of actual notice. It may tend, and in the absence of sufficient rebutting evidence, suffice to prove it; that is, to support the presumption and finding of actual notice; but it may be rebutted and overcome. We think in this case it was clearly overcome and did not warrant the finding; and that under this count, proof merely that the company ought to have known it, would not be sufficient or proper.

We are further of opinion, for the reasons above stated, that if either of these three counts, under each of which the defendant was found guilty, could be regarded as a count for negligently suffering the roof to be and remain in a dangerous condition, the evidence is insufficient to sustain it.

The first and third instructions given for plaintiff imply that there was evidence tending to prove an assumption by the defendant, in his favor, of an absolute duty to keep the roof safe; and the fourth holds proof that the condition alleged had continued " for such a length of time that by the exercise of reasonable care and caution the defendant could have known it," to be competent and sufficient to establish the fact of actual notice as alleged in the sixth count; all of which we think materially wrong.

These views make it unnecessary to consider some other questions, mostly technical, which were elaborately discussed by counsel. They ought not to arise on another trial. It may be proper, however, to say that we do not think the court erred in overruling the motion in arrest of judgment. Each of the counts alleged an absolute duty resting immediately upon the company and its violation by nonfeasance. This involved no intervention by servants. The failure to have the act of duty performed, if not by one agency, then by some other, must have been the failure of the defendant as directly as a corporation can fail; and therefore the rule declared in Joliet Steel Co. v. Shields, 134 Ill. 209, would not apply. Had the alleged wrong consisted in misfeasance or malfeasance it would or might have been otherwise.

And we may add that the instruction numbered five, asked for defendant but refused, should have given to the jury a definition of fellow-servants and left to them its application to the evidence.

But for the reasons indicated the judgment will be reversed and the cause remanded.

*Reversed and remanded.*