## Penwell Coal Mining Co. v. Diefenthaler, Administrator, etc.

1. *Corporations, etc.—Duty to Make Works, etc., Reasonably Safe.*— It is the duty of a corporation to use ordinary care to make its works and appliances reasonably safe and fit for their intended uses.

2. *Corporations—Duty in Employing Agents.*—With a corporation the work of planning, selecting material for, making and placing appliances and constructions required in its business must of necessity be intrusted to natural persons as its agents. Its duty in this respect requires of it no more than to take ordinary care, and appoint for the work such agents as are competent and likely to do it properly.

3. *Instructions—Statement that Certain Facts Amount to Culpable Negligence, Error.*—While a person (Robert H. Kuhn) employed as a blacksmith and a doer of general work about a coal mine was assisting the superintendent to prop up the pocket chute, then containing several tons of coal, it fell upon him and killed him. He had, himself, helped to construct the chute originally, and was as well acquainted with its condition as the company or any of its officers. A suit for damages brought by his legal representative resulted in a verdict of $3,500. It was sought to sustain the verdict upon the grounds, viz., the insufficiency of the chute on account of its construction to sustain the weight put upon it, and the dumping of coal into it while the deceased was at work under it, both of which were charged as negligence on the part of the company; on the trial the court gave the following instruction for the appellee: "The court instructs the jury if they believe from the evidence that the chute was out of repair and unsafe, and that it was known to the defendant, and that the manager for the company ordered the deceased to help about the chute in propping it up, and at the time the chute was heavily loaded with coal, and while deceased was under the chute, endeavoring to prop it up, coal was being dumped into the chute, of which the deceased was not informed, this would be culpable negligence under the circumstances." *It was held error*, because it informs the jury that certain facts amount to " culpable negligence" and by it the jury must have understood that the "culpable negligence" was actionable negligence, warranting and requiring a verdict for the plaintiff. Its hypothesis does not include the necessary element on the

Penwell Coal Mining Co. v. Diefenthaler.

part of the deceased, that at the time of the accident he was using due care, etc.

4. *Instruction Not to Withdraw Evidence from the Jury.*—The court also erred in giving for the plaintiff the following instruction : " If the jury believe from the evidence that said Robert H. Kuhn was called by the manager to assist about said chute, and the manager knew it was dangerous and risk was incurred in working about it, and he did not inform the deceased of said danger, and the deceased did not know of it, then the company was guilty of culpable negligence on account of such conduct of its manager." The instruction withdrew from the consideration of the jury all evidence tending to show that the supposed ignorance of the deceased was due to his own fault.

5. *Instructions, Presumptions of Law Asserted to be Conclusive.*—The court erred in instructing the jury that " if they believe from the evidence that the deceased was in the employ of the defendant, and the foreman of the company directed the deceased to help about the chute just before it fell, then it was his duty to obey, and if he went under it with the foreman, then the law would presume the deceased used due care under all circumstances, and that he would not rush recklessly into danger if he knew it," for the reason that it asserts a presumption of law to be conclusive, arising upon the facts that the deceased was in the employ of the company and was directed by its foreman to go under the chute as he did; these facts being undisputed the jury was bound to find that the deceased did exercise all due care on his part.

Memorandum.—Action by personal representatives for death by negligence, etc. Appeal from a judgment for $3,500, in favor of plaintiff, rendered by the Circuit Court of Christian County; the Hon. JESSE J. PHILLIPS, Circuit Judge, presiding. Heard in this court at the November term, A. D. 1892, and reversed. Opinion filed March 6, 1893.

The opinion states the case.

APPELLANT'S BRIEF.

Negligence is a question of fact which must be left to the determination of the jury. Galena & Chicago Union R. R. Co. v. Dill, 22 Ill. 271; Pennsylvania Co. v. Frana, 112 Ill. 405; L. S. & M. S. Ry. Co. v. Parker, 131 Ill. 564; I. C. R. R. Co. v. Slater, 139 Ill. 199; St. Louis Bridge Co. v. Miller, 138 Ill. 465; Kolb v. O'Brien, 86 Ill. 211; Graves et al. v. Colwell, 90 Ill. 620.

The plaintiff could only recover for the negligence charged in the declaration, and not for any negligence. Camp Point Mfg. Co. v. Ballou, Admr., 71 Ill. 419; C., B. & Q. R.

R. Co. v. Payne, 49 Ill. 500; C., C. & I. C. Ry. Co. v. Troesch, 68 Ill. 545.

E. A. HUMPHREYS, JR., JOHN E. HOGAN and JOHN G. DRENNAN, attorneys for appellant.

ANTHONY THORNTON, attorney for appellee.

OPINION OF THE COURT, *the Hon. George W. Pleasants, Judge.*

Robert H. Kuhn was employed by appellant as a blacksmith and to do general work about its mine at Pana. On the 19th of July, 1890, while assisting the superintendent to prop the pocket chute, then containing several tons of coal, it fell upon and killed him. He left a widow and three young children for whose use this action was brought, which resulted in a verdict for $3,500 damages, and judgment thereon.

The main chute was of the usual kind, about ten feet wide and thirty in length, twenty-two above ground at the upper end and slanting at an angle of thirty degrees. Its bottom was tight from the tipple for a distance of five feet, and the rest of the way of iron rods, two inches apart, to make a screen through which the slack dropped into the pocket. This was of the same width, about three feet deep at the lower end, lessening to nothing at the upper end of the screen. Its capacity was six to eight tons, and when full up to the screen bars this slack made a solid floor for the main chute, over which the coal, as dumped into it, slack and all, would pass down it into cars on the switch track below. Coal so delivered was called the "mine run," and much of the product of this mine was so delivered. The pocket was, therefore, full for some time almost every day.

It was fastened to the upper chute by six or eight iron rods. The two opposite at the upper end went through the beams or large plates of the main chute and the stringers of the pocket, bolting them close together. The other opposite

pairs, which were longer because of the increasing depth of the pocket, also went through these beams, but passed down the outsides of the stringers, then under them at a right angle, and then up them on the insides, three inches, at another right angle, making rectangular hooks in which the stringers rested. Studding and boards nailed to both also helped to support it.

It was made and put up by the company's carpenter and blacksmiths, about the first of May, 1890, to take the place of one in previous use which the president thought was not close enough to the main chute. John Edgar, the carpenter, had an experience of twenty years in his trade, and had worked for Mr. Penwell, the president, for a year, but this was the first he did about the mine. Josiah Reed, the principal blacksmith, had worked at his trade for eighteen years, eight of them for coal mining companies, of which the last three were for appellant. Kuhn, his assistant, had had less experience, and had worked for Reed for over three years, and been his assistant at the mine of the Pana Coal Company; was thirty-eight years of age, running a separate fire and considered a competent blacksmith.

The only specific directions given, were to make it closer to the main chute, without a door, and of straight timber, and they were expressly charged to use the best material, do the work as well as they could, and make it strong and safe, to bear all the strain that would be put upon it.

The two survivors claim that they did so, as far as they know. Edgar testified that the lumber used was of the best he could find in the yard, being all select bastard pine, which is very strong. The stringers were six by six inches, into which the cross pieces, four by six, were mortised two by six, and the floor was of two-inch boards with sheet iron over it. Reed and Kuhn did the iron work together; the one about as much as the other. The rods used were seven-eighths inch round, being a size larger than they thought necessary. They both knew, as did Edgar, all about the chute, how it was constructed and supported, and what was to be required of it. Reed and Edgar conferred and agreed upon

the hooks, to avoid the weakening of the stringers by boring. Reed understood that bending them, as they did, would weaken the iron to some extent, but his judgment, formed mainly from experience, was that, bent as they were, they would bear many times the weight to which they were to be subjected. He and Kuhn talked about this while making them.

When finished they all pronounced it an excellent job. Mr. Henley, the superintendent, though not a mechanic, so considered it. The employes about the mine were constantly passing under it and nobody appears to have had a thought of danger from it. Mr. Rutledge, the State Mine Inspector for that district, specially qualified by large knowledge, both theoretical and practical, to judge of the matter, testified from a general observation of it, when his attention was called to it by the superintendent, that it appeared to be all right, and that the method of supporting by hooks, as here, was used "in places, but not generally." He noticed these rods sufficiently to be satisfied that they were "reasonably safe." The pocket was filled every day or nearly every day, but showed no sign of weakness until a week or two before the accident, when it appeared that the second cross piece from the lower end was cracked and the third slightly "swagged" or bent. These were then strengthened by putting under and bolting to each, along its whole length, a bar of iron three inches wide and three quarters of an inch thick. Reed and Kuhn did this work also, and both were satisfied that it made them "a great deal stronger" than they were originally and that they would stand.

On the morning of the accident, the superintendent observing that the pocket was about two-thirds full, and knowing it was to be filled and to remain full for a longer time than usual, determined to put a prop under it. He testified very positively that he did not know or fear it was dangerous; that he saw no indication of its weakness, but because of the crack above mentioned, and the intention to keep it full so long, he did so "to avoid any possibility of

danger." As he was going for the prop he saw Kuhn standing in his shop door and beckoned to him to come along. A few moments later they were seen together under the chute, the superintendent pointing up. Then they proceeded to place the prop, but finding it too short, Kuhn got down on his knees to put something under it. The superintendent at that moment heard a crack as of breaking wood and ran, calling on Kuhn to do likewise. The fall followed on the instant. Henley barely escaped, but Kuhn was caught and crushed. Some of the cross-pieces were found to be broken, some of the hooks straightened out and others broken off. Samuel Collins, a witness for the plaintiff, was sitting on a car by the chute and saw the fall; other witnesses whose opportunity to know was, perhaps, not so good, leave it uncertain which part first gave way, but he thought it was the hooks. He had stopped his car within twenty-five or thirty feet from the men, to see them place the prop. They were both under the chute trying to prop it at about the middle. A box or car load of coal was dumped into the main chute while they were so employed, and almost immediately thereafter he saw the middle hook on the north side begin to spread and the fall followed instantly. He thought the timbers were broken, not by the weight upon them but by the fall on uneven ground. Several of the witnesses testified that the coal was dumped at the tipple of the main chute which was supported by a large upright post, and having to pass down five feet before it would be screened, would have no effect upon the pocket if it was full, and if not full, only to the extent of the additional weight dropped upon it through the screen bars; and that the coal cars, which were of different capacities, would lose, by screening, from 1,000 to 1,200 pounds.

Such are the material facts as shown by the record. It is said that the justice of the verdict may be maintained on either of two grounds, viz., the insufficiency of the chute, on account of its construction, to sustain the weight put upon it, and the dumping of the coal while the deceased was at work under it, by order of the superintendent, both of which are charged as negligence on the part of the company.

But to maintain it on the first of these grounds it should further appear that the defect in construction, if any there was, was known, or by the exercise of ordinary care would have been discovered by the company before the injury was done, and was not known, nor by the exercise of ordinary care would have been discovered by the deceased.

If appellant had no such knowledge or means of knowledge, it could not have been guilty of any negligence in respect to the construction; for that is but another way of saying that it took ordinary care to make the chute reasonably safe and fit .for its intended use, which was the full extent of its duty in the premises.    Consolidated Coal Co. v. Scheller, 42 Ill. App. 624–5, and cases there cited.   And if the deceased had such knowledge or means of knowledge, he did not exercise ordinary care for his own safety (C. & E. I. R. R. Co. v. Hines, 132 Ill. 168), and his failure to do so, would bar this action.

In neither of these cases could the verdict stand upon the second ground stated, as an independent cause of action. For it is clear that both appellant and deceased knew the chute was constructed to be filled almost daily and by just such dumping as was here shown.   Then if appellant used due care in its construction and was innocently ignorant of. the defect, it could not be blamable for using the chute as it was intended and made to be used; and if the deceased knew, or by due care would have known of the defect, then he voluntarily assumed the risk he incurred from such use.

It can not well be claimed that in the act of dumping, or in the time, manner or amount of it, there was anything unusual, not to have been expected, or in any respect negligent, unless it was done in view of defects in the chute which were known or ought to have been known to appellant.    The case for appellee must therefore stand, if at all, upon the first ground stated, namely, negligence on the part of appellant in respect to its construction, and due care for his own safety on that of the deceased.

The defects complained of are not specifically set forth in. the declaration, but as indicated by the evidence and stated

in the argument, are the insufficiency of the timbers and hooks to sustain the weight they were intended to bear; and the questions of fact were (1), did appellant exercise ordinary care to make them reasonably safe and sufficient for that purpose; (2) did it know, or would it have known, by taking ordinary care to ascertain, that they were not sufficient, and fail to use ordinary care to make them so, before the accident occurred, and (3) did the deceased in going under it, as he did, exercise ordinary care for his own safety?

We do not propose to consider the evidence in detail. From the statement already made, we think it clear that upon each of these questions the case was, to say the least that should be said for appellant, a close one.    Appellant was a corporation.    The work of planning, selecting material for making, and placing the chute, was of necessity to be intrusted to natural persons as its agents.    Its duty required of it no more than to take ordinary care to appoint for this work, only such agents as were competent and likely to do it properly.    Cooley on Torts, pp. 550–1 and note, 557 and note 1; Warner v. Erie Ry. Co., 39 N. Y. (12 Tiffany) 468; Cooper v. Hamilton Mfg. Co., 14 Allen, 193; Brown v. Carrington Cotton Co., H. & C. (Hulstrom & Coltman, exchequer,) 511; Camp Point Mfg. Co. v. Ballou, 71 Ill. 417; Consolidated Coal Co. v. Scheller, 42 Ill. App. 619.    The insufficiency of the work done, whether through the incompetency or carelessness of the agent, would not be evidence of a want of such care in his appointment.    A contrary rule would make the employer a guarantor to each, of the competency and faithfulness of all its other employes.    The structure here required was a plain, if not a rough one, of wood and iron. Appellant had in its employ experienced, and so far as appears, except for this work, competent and faithful mechanics in wood and iron work.    To whom else, then, would appellant, in the exercise of ordinary care, intrust it?    It may be that Edgar had never before made, or assisted in making, just such a structure, but so far as the wood work was involved, it was clearly within the line of the business he had

followed for twenty years; he knew just what was wanted and for what use, and the old chute was to some extent a guide.   The blacksmiths had had some special experience, in connection with the chute of the Pana Coal Company.

Then it may be safely said, that the employment of these men, with the instruction expressly given as to the materials and work, strongly tended to prove due care on the part of appellant to make the chute reasonably fit for its intended use.

Edgar, called as a witness by plaintiff, was asked to tell the jury what he told Henley, after he got through with his work, about its sufficiency, and his answer was :   " What I spoke about, the chute was all right and looked very well. I was a little bit afraid to load coal with a ' mine run,' with constant usage.   We had not got some things in it quite heavy enough."   The record does not make it clear that he expressed this fear to the superintendent.   But the next question was :   " Did you mention to him what ? " and he answered, " No, sir; I don't think I did."   On his cross-examination, he was asked if he did not say, in substance, that it was the best job he ever saw completed for a chute, and answered, " Yes, sir, a great deal better job than the one here."

It stood the test of two months' use, being often filled to its utmost capacity, without showing a sign of weakness. During all that time, the timbers, rods and hooks were in plain view, and many persons must have seen them.   The employes about the mine were constantly passing under them.   Henley called the attention of the inspector to the work, as if with pride in it.   Nobody appears to have observed any defect in the construction.   Then when the two cross-pieces showed the need of it, they were promptly repaired in a manner and by means that have not been criticised.   Whether the weakness shown by them was in their size and material, or due to some latent defect, does not appear; but it is to be noticed that the first cross-piece from the bottom, which was of the same size and material, though subjected to a greater weight, showed none.

If appellant was chargeable with actual notice or suspicion of the alleged defects, or any other, before the accident, it was through Henley, its superintendent. It is so claimed and so only. Yet it must be admitted there was strong evidence to the contrary. His own testimony was most direct and positive. Of even greater weight is the fact that he exposed himself to the danger as freely and fully as he exposed the deceased. No higher test of his sincerity and veracity could be required. In the absence of evidence to the contrary, the presumption from his conduct is that he did not know there was danger. C. & E. I. R. R. Co. v. Hines, 132 Ill. 169. That he recognized the possibility of danger, and took extraordinary care to meet it, can hardly be said to contradict or weaken his testimony, corroborated by his act.

Upon the third question—that of due care on the part of the deceased—the evidence for appellant was, perhaps, still stronger. If there was any one thing about the construction of this chute which the appellant knew or ought to have known and which the deceased did not also know, or have abundant means of knowing, by the exercise of ordinary care, it has not been pointed out, nor have we been able to discover it from the evidence. We understand it to be claimed that the defect which caused the fall was the use of the hooks described, as the means of support, and it is said that this was not only patent, but "absurd." Then who knew it or should have known it better than the blacksmith who acquiesced in the plan and helped to make the hooks, with full knowledge of the purpose, and ample means of knowing the strain they were to bear?

It appears that he was employed to do general work about the mine when not occupied as a blacksmith. He therefore knew that he, like other such employes, was liable to be called upon, in the course of his employment, to work or pass under this chute, and had a personal interest, besides a duty to his fellows and the company, to know its condition as to safety. If it was unsafe and he knew it, or by ordinary care would have known it, and yet voluntarily exposed

himself to injury by its falling, he could not complain of such injury, if living, nor can his representative, the appellee. The event shows it was unsafe. Assuming that the company knew, or ought to have known it, the question remains, did not he also know it, or was he not bound equally with the company to know it?

Upon this question the case was certainly close enough to require that the instructions to the jury should be clear and accurate.

Appellant insists that those given for the plaintiff were not. The first, it is said, ignores the question of Kuhn's knowledge of the cause of the injury. But it includes in the hypothesis stated the fact that the chute fell upon and killed him while he was in the employ of the company, and " in the exercise of reasonable care."

In C. & E. I. R. R. Co. v. Hines, 132 Ill. 168, the Supreme Court say: " The allegation of due care in the deceased negatives negligence, and, by implication, that he had knowledge of the defects by reason of which he was injured. * * * The allegation is therefore sufficient on error, if, indeed, it should be admitted that it would not be so on demurrer; " and we presume the implication from the same language in an instruction would be the same, and so avoid this objection.

The second and third are complained of as making negligence a question of law, and thus invading the province of the jury. By the second it is declared that if the chute was out of repair and unsafe, and known to the defendant to be so, and its manager ordered deceased to help about propping it, and at the time it was heavily loaded with coal, and while he was under it, endeavoring to prop it, coal was being dumped into it, of which he was not informed, " this would be culpable negligence under the circumstances."

In L. S. & M. S. Ry. Co. v. Johnsen, 135 Ill. 647, speaking of alleged negligence on the part of the plaintiff, it was said : " The court can never be called upon to say to a jury that negligence has been established as a matter of law, unless the conduct of the injured party has been so clearly

and palpably negligent that all reasonable minds would so pronounce it without hesitation or dissent. 'Negligence can not be conclusively established by a state of facts upon which fair-minded men may well differ.' ' C. & E. I. R. R. Co. v. O'Connor, 119 Ill. 586; T., H. & I. R. R. Co. v. Voelker, 129 Id. 540. Unless the negligence of the plaintiff is proven by such conclusive evidence that there can be no difference of opinion as to its existence upon a mere statement of the facts, the jury must pass upon it."

Of course the same rule must apply to the case of alleged negligence on the part of the defendant.

For appellee it is contended that this instruction is fairly within the exception allowed; that the facts supposed, absolutely necessitate the conclusion, drawn as a matter of law, that there could be no condition, or, at least, that there was no evidence in this case of any condition, consistent with those facts, that would cause any fair mind to dissent from or hesitate about it.

We do not concur in this view of the instruction. It closes with the conclusion quoted, by which the jury must have understood that the " culpable negligence " mentioned was actionable negligence, warranting and requiring a verdict for the plaintiff. With that meaning, we think it was materially wrong. Its hypothesis does not include the necessary element of due care on the part of the deceased. It limits the ignorance of dangerous conditions to the fact that coal was being dumped into the chute while he was at work under it, and does not exclude the supposition that even that was due to "culpable negligence" on his own part. It is entirely consistent with all the facts, hypothetically stated, to suppose, and there was evidence strongly tending to prove, that he knew, or that it was his own fault if he did not know, as well as appellant, the condition of the chute as to safety, and the extent to which it was already loaded, and the custom and course of business at the mine, according to which it was liable to have more coal dumped into it while he would be under it. See Pennsylvania Co. v. Stoelke, 104 Ill. 204. The jury should have

been allowed to consider the evidence tending to prove these conditions, as bearing upon the question of due care by the deceased, and if they found he failed to exercise it, their verdict should have been for the defendant, notwithstanding the fact stated in the instruction.

The third was as follows: "If the jury believe, from the evidence, that said Robert Kuhn was called by the manager to assist about said chute, and the manager knew it was dangerous, and risk was incurred in working about it, and he did not inform the deceased of said danger, and the deceased did not know of it, then the company was guilty of culpable negligence on account of such conduct of its manager."

This also withdrew from the consideration of the jury all the evidence tending to show that the supposed ignorance of the deceased was due to his own fault. It may well be doubted whether he was in fact ignorant of any danger that was known or ought to have been known to the manager; but if he was, there certainly was evidence tending to show it was because he culpably neglected to use his means of knowledge. How could he have failed to know as much about the chute itself? And as to the dumping, which is the only other danger suggested, his shop was only about ninety feet from the chute, and he had worked about the mine long enough to know from the course of operations there, that coal was liable to be dumped at any time, whenever it was ready. If he did not know it was to be dumped while he was to be under the chute, neither does it appear that the manager did. It would seem that he was as clearly bound as the manager to know if danger was to be apprehended from that cause, and might as well have insisted that before going under it the chute should be emptied and the operation of dumping suspended.

The fourth holds that the commands of its representative "are the commands of the company and the company are responsible for any injury resulting from such commands;" which is complained of as not limiting the right of recovery to injury from the negligence charged in the declaration.

Penwell Coal Mining Co. v. Diefenthaler.

We do not see how this, if error, could have prejudiced the defendant in this case; but we think it objectionable for another reason; that the company is not so liable if the negligence of the party injured, materially contributed to such result, and the evidence required that modification of the instruction. Like those above noticed, it ignores the substantial and prominent defense. supported by no little proof that the deceased knew or is chargeable as if he knew the danger to which he exposed himself.

The seventh was as follows: "The court instructs the jury that if they believe from the evidence that the deceased was in the employ of the defendant, and the foreman of the company directed the deceased to help about the chute just before it fell, then it was his duty to obey, and if he went under it, with the foreman, then the law would presume the deceased used due care under all circumstances, and that he would not rush needlessly into danger if he knew it."

This instruction, unlike the others, recognizes the defense referred to, as attempted, but meets and defeats the attempt by a presumption of law which is asserted to be conclusive, arising upon the facts that deceased was in the employ of the company, and was directed by its foreman to go under the chute as he did. These facts being undisputed, the jury was bound, regardless of all others, to find that the deceased did exercise all due care on his part.

We know of no authority for holding this presumption conclusive. C. & E. I. R. R. Co. v. Hines, 132 Ill. 168–9, the only case cited in support of the instruction, holds it to be matter of defense that the deceased had knowledge of the defects through which his injury was received; but the court adds: "Unless it shall appear, from the evidence, that he had such knowledge, it will not be presumed, since no one is presumed to knowingly incur physical pain and death, where he can avoid it at his discretion." This does not touch the question of the effect of a direction by the employer to the employe, but only the presumption from the natural instinct of self-preservation, and holds it to be rebuttable. That instinct and duty would have required the deceased in

this case to refuse obedience to an order which endangered his life or limb, if he knew or apprehended such danger.

Whether he did know it or ought to have known it, was a question clearly raised by the evidence, and the jury should have been allowed to consider and decide it. This instruction, upon the admitted facts, decided it for them as a matter of law. If he was "bound to obey" the direction, as it absolutely asserts, he could not, in obeying, be guilty of negligence, however reasonably, strongly and clearly he may have apprehended the fatal consequence. But he was not so bound.

The misleading effect of the errors above indicated could not be corrected by the instructions given for the defendant. Therefore the judgment will be reversed, and the cause remanded.