Spear, J.
The first proposition argued is that the common pleas erred in overruling the demurrer to the petition. A majority of the court is of opinion that, under our liberal rules of construction, the pleading in the absence of a motion to make more definite, is sufficient.
The next proposition is that the common pleas erred in giving, in its charge to the jury, one of a series of seven requests asked by plaintiff. To this the exception entered was in this form: “To which ruling of the court in giving the special *551 charges, as asked by the plaintiff, the defendant at the time excepted.” We are of opinion that this exception is too general to bring’ the objection before a reviewing court. The exception should have been directed to the particular proposition to which objection was made.
Another proposition argued is that the trial court erred in refusing to give to the jury instruction No. 10, asked by the defendant, which inr struction is as follows
“10. The defendant asks the court to say to the jury that if they find from the evidence that Clay was in control of the room where he got killed, that then under the criminal statute, section 6871, Revised Statutes of Ohio, it was his duty to properly post the room, and no custom existing at the time at the mine could relieve him of that duty. ’ ’
Upon this point, in its general charge, the court said to the. jury that if they found that Clay “violated a criminal statute, for which violation he could have been prosecuted had he lived, such violation will not preclude a recovery in this action. ’ ’
It is further contended that the undisputed evidence given at the trial shows that there was no case made by the plaintiff justifying a verdictj and that the trial court, therefore, erred in not sustaining the defendant’s motion for a new trial. In order to judge of the bearing of the request which was refused, and the charge given respecting the section of the statute referred to, and the claim above stated, it will be necessary to look somewhat at the facts as shown by the record. It is proper here to correct a misapprehension on the part of counsel for defendant in error. They contend in their brief that the general charge of the *552 court cannot be considered because it was not made part of the bill of exceptions. Doubtless the manner in which the record is printed misled the counsel. The original bill of exceptions shows that the charge is properly attached to and made part of the bill, and we are not, therefore, embarrassed by a defective record.
Geo. D. Clay, the deceased, a man of about twenty-two years of age, was employed at the time of his death in working a machine used in mining coal in the mine of the defendant company. With him at the time, as a helper, was one Harry Devault, who met his death at the same time and by the same accident. Clay had been engaged in mining about three years in all, most of the time as a helper, having had charge of the machine about two months. He was a man in good health, and of averag’e intelligence. The mine embraced a number of rooms in which cutting with the machine was done. The operation of the machine is to punch or jab the coal and so make a bearing in and under the coal for the driller who follows and drills holes in the face of the coal near the top for the reception of the blasting material. The driller is succeeded by the filler, who shoots down the coal, loads it into the cars, etc. Three sets of men are thus engaged in the room, but at different times, and at distinct employments. Necessarily, therefore, the one having’ charge of these several operations has, for the time being, control of the room.
The man Dalton was a filler, and had enjoined upon him, in addition, by direction of the mine boss, one Dilch, the work of posting in the two rooms where he worked as filler, one being the room in which Clay met his death. He had worked *553 in the mine some eighteen months, having been employed originally as a helper, which position did not require him to attend to the work of posting, and later had been advanced to the place of a filler, and had been engaged in posting only about two.months at the time of the accident. In the course of his work he was required to shoot down the coal, fill it into cars, prop the roof where necessary, and get the room ready for the machine to come in again. In the two rooms thus posted by Dalton, Clay had followed in after him during the two months and cut the coal. The operation of cutting occupies about two and a half hours in each room. Ten rooms are usually assigned to one machine, and are cut one after another until the entire number are cut, when the first room is again reached. It does not appear that either Clay or Devault at any time made complaint of the way in which Dalton was performing his duty, either to Dalton himself, or to the bank boss.
Dalton was called by the plaintiff below, and it was shown by his testimony, not contradicted, that on the day Clay and Devault were killed, Dalton was present when they started in to cut the room. He said to Clay that he had better examine the room to see whether there was anything loose or not; to see whether there was any danger there or not. Thereupon Clay took a pick and sounded the roof; and said it was all right. It appears by this and other witnesses that sounding the roof with a' pick was the usual way of determining whether it. was secure or not, and, by witnesses called by plaintiff, that the sounding of the roof was not a hard thing to learn, but an easy thing, and that a common man could do it; if a man had just gone in green he wouldn’t know, but if he had gone *554 in knowing the place to be dangerous and tried to learn, it is easy. No evidence was offered tending-to show that any propping- done by Dalton previously to the workin the room in which the decedents were engaged at the .time of the accident, had been defectively or insufficiently done. Nor was any evidence given by plaintiff tending- to show that the company did not furnish proper timber for supporting the roof at the place Clay was working, but evidence given by defendant, undisputed, shows that proper timber w’as so furnished.
Clay and Devault were killed by the falling upon them of a piece of slate some nine feet square and about a foot in thickness.
At the time of the accident, and for a long time before, a custom existed at this mine whereby the work of posting and propping was given to the workmen called fillers. By force of this custom Dalton was required to post and prop, as before stated.
In their respective duties Daltqn did not have the control of Clay, nor did Clay have control over Dalton. Each was under one common superior called the mine boss.
It was in evidence by the defendant, not contradicted, that the mine boss g-ave instructions to both Claj and Devault to the effect that they were to cut nothing they thought dangerous; to take nobody’s word for it, but to examine the place for themselves before they went to work, and if found unsafe leave it until it was fixed.
The section of the Revised Statutes referred to provides, among other things, that “whoever knowingly does any act whereby the life or health of the persons, or the security of any mine and machinery are endangered, or any miner or' other *555 person employed in any mine governed by the statute, who intentionally and willfully neglects to securely prop the roof of any working place under his control, shall be guilty of an offense,” etc. The same section makes it the duty of the mine owner to keep at the working place of the miner a supply of timber suitable for posting. No doubt exists that the statute applies to this mine. The provision quoted was enacted in substance April 29, 1872 (69 Ohio Laws, 193), the words being as follows: “* * ■* or- if any miner or person employed in any mine governed by the provisions of this act shall neglect or refuse to securely prop or support the roof and entries under his control,” etc. The provision has been continued in all the amendments to the act to the present. The act was entitled “An act reg-ulating coal mines, and the working thereof, ’ ’ and has for its principal object, apparent on the face of all its provisions, the protection of the health and lives of those who work in coal mines.
- .So extensive is this industry in the state that legislation affecting those engaged in it as a daily vocation may be regarded as of public interest, and where a statute, as does the one cited, undertakes to outline and prescribe a particular duty owing- by persons so engaged not only to themselves but to others, it may be properly regarded as indicating a public policy on the subject, and where the same provision has remained in force for so long- a time, about twenty years at the time of this occurrence, the policy may be treated as á settled one. This provision clearly points out a duty devolving upon all who-come within its terms, a grave duty, one so nearly related to the protec *556 tion of life and. limb that it ought not to be lightly esteemed nor easity avoided.
In the case of Railway Company v. Spangler, 44 Ohio St., 471, where the company sought to avoid liability for an injury caused to one of its employes by reason of the negligence of another employe placed in authority over him because of a contract between the company and the injury party, made as part of the contract of employment, that such liability should not attach, this court held that the plea could not avail inasmuch as the liability of the master was founded upon consideration of public policy. And in the opinion of Owen, Ch. J., it is said: “The policy of our law being well settled, it only remains for us to inquire whether railroad companies may ignore or contravene that policy by private compact with their employes, stipulating that they shall not be held to a liability for the negligence of their servants which public policy demands should attach to them. The answer is obvious. Such liability is not created for the protection of the employes simply, but has its reason and foundation in a public necessity and policjr which should not be asked to yield or surrender to mere private interests and agreements. ”
If the principle of this case has application to.the one at bar, and no reason is perceived why it does not, it would seem to follow that the custom set- up in the petition ought not to be held to have absolved the deceased from the obligation enjoined by the statute. The object of the statute is to encourage carefulness; regard not only for the life of the miner, but for the lives of all who may be subjected to like risks. It imposes an obligation to perform a duty to others. Anything, *557 therefore, which tends to operate in opposition to that obligation would violate the policy of this statute, and hence, whatever right the custom at this mine imposing upon Dalton the work of propping and posting the roof of the room, may have given Clay to call upon Dalton to do the manual work of posting, and delay his own work until that had been properly done, such custom ought not to have the effect to exonerate Clay from the duty enjoined by the statute, nor shift the risk undertaken by himself over upon the company. We think the trial court erred in refusing to give the instruction requested and in the charge as given upon the subject.
It is insisted by the defendant in' error that the duty of the defendant company in respect to furnishing a safe working place, was such that it was liable for the negligence of Dalton, irrespective of the question of his incompetency, and of the Company’s knowledge thereof, and the case was given to the jury by the learned judge of the common pleas upon this theory. Necessarily this view of the law proceeds upon the assumption that Clay and Dalton were not fellow servants, but that, as respects the posting and propping, Dalton was the alter ego of the company, and hence the superior of Clay. The claim is sought to be sustained by a class of cases which hold that the duty of the master to provide a safe working place and machinery for his employees, cannot be delegated so as to absolve the master from liability in case of failure of the vice-principal to perform that duty. It does not seem necessary to review these cases. They are, as a rule, based upon the proposition that where the appliance, or place, is one which has been furnished for the work in which the *558 servants are to be engaged, there the duty above stated attaches to the master. We need not discuss this proposition for we have not that case. Here the place was not furnished as in any sense a permanent place of work, but was a place in which surronnding conditions were constantly changing, and instead of being a place furnished by the master for the employees within the spirit of the decisions referred to, was a place the furnishing’ and preparation of which was in itself part of the work which they were employed to perform. The distinction is shown in a number of cases, among which may be cited Fraser v. Red River Lumber Co., 45 Minn., 235; McGinty v. Athol Reservoir Co., 155 Mass., 183, and Consol. Coal Co. v. Scheller, 42 Ill. App., 619. See also Hall v. Johnson, 3 Hurlst. & Colt., 589; Waddell v. Simoson, 112 Pa., 567.
It cannot be necessary to restate the rule of law as to what determines the relation of fellow servant as it is recog’nized in this state. The principle laid down in C., C. & C. R. R. Co. v. Keary, 3 Ohio St., 201; in Whaalan v. Mad River & L. E. R. Co., 8 Ohio St., 249; in Columbus & Xenia R. R. Co. v. Webb, 12 Ohio St., 475, and reiterated in divers cases since, is too well established t,o need repetition, and we think that the facts in this case clearly bring the two men Dalton and Clay into that relation. Applying that rule to this case it was necessary, in order to a recovery, that the plaintiff should show, upon this branch of the case, not only that Dalton was guilty of negligence which was the direct cause of the death of Clay, but that he was incompetent and that his ineompetency was known or could with reasonable diligence *559 have been known to the company prior to the accident; and beyond this, if plaintiff’s proof raised the presumption that such ineompetency was known to Clay, or with reasonable diligence might have been known to him, then to overcome that presumption. If so known, the duty, therefore, to notify the bank boss of the fact, and refuse to continue in the dangerous employment until the risk was removed, followed. As to the effect of a neglect of this duty, see Coal & Car Co. v. Norman, 49 Ohio St., 598. Instead of this being done, it seems to us entirely clear, by the case made by the plaintiff,- that whatever ineompetency has been shown in the work of Dalton was known to Clay; at least he had the fullest opportunity of noticing Dalton’s manner of posting from day to .day as he followed after’ him from room to room to cut the coal; and, so far as the record shows, no effort to give notice of ineompetency was made. And while it was true that it was the duty of Dalton, as between him and his employer, to post the roof of the room to prevent it from falling, yet the plaintiff’s evidence shows that Dalton, Clay and Devault were engaged in one common object in which it was not less the duty of Clay and Devault than of Dalton, because of the nature of the employment, their common interest and their common peril, to watch every appearance of danger, and, if we may consider the uncontradicted evidence of defendant, because of the instructions of their employer the, further duty to give warning promptly, and forbear exposure of their persons while the dangerous conditions existed.
It appears to us, upon a consideration of the whole record, that the verdict and judgment were *560 the result of the erroneous view of the law taken by the trial court; inasmuch as there was no evidence given at the trial which, in law, will sustain the verdict,
The judgment toill, therefore, be reversed.